# EXHIBIT  A

Slip Copy
Slip Copy, 2006 WL 328348 (E.D.Pa.)
**(Cite as: 2006 WL 328348 (E.D.Pa.))**

Page    1

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
**John DELONG**
v.
**AETNA LIFE INSURANCE COMPANY.**
**No. CA NO. 05-3371.**

Feb. 9, 2006.

Nicholas J. Renzi, Stampone and D'Angelo, Cheltenham, PA, for John Delong.

Kathryn M. Schilling, Eric J. Bronstein, Elliott, Reihner, Siedzikowski & Egan PC, Blue Bell, PA, for Aetna Life Insurance Company.

*MEMORANDUM OPINION AND ORDER*

RUFE, J.

*1 Plaintiff brought this action under the Employee Retirement Insurance Security Act of 1974, 29 U.S.C. section 1001, et seq., as amended ("ERISA"), claiming Defendant wrongfully terminated his long-term disability benefits. Presently before the Court is the Defendant's motion for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. For the reasons that follow, the motion is granted.

Under 56(c), summary judgment may be granted when, "after considering the record evidence in the light most favorable to the nonmoving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." [FN1] For a dispute to be "genuine," the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. [FN2] If the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." [FN3] The non-moving party may not rely merely upon bare assertions, conclusory allegations, or suspicions. [FN4]

FN1. *Turner v. Schering-Plough Corp.,* 901 F.2d 335, 340 (3d Cir.1990).

FN2. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN3. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

FN4. *Fireman's Ins. Co. of Newark v. DuFresne,* 676 F.2d 965, 969 (3d Cir.1982).

As the Court finds no genuine disputes as to any material fact, the Court holds this case is suitable for summary disposition.

Plaintiff was employed at the University of Pennsylvania ("Penn") as a Financial Aid Officer when he fell down a flight of stairs while at work on October 4, 1996. That was also the last day Plaintiff worked. Plaintiff applied for and began receiving long-term disability benefits under Penn's employee benefit plan. When Plaintiff began receiving disability benefits, Penn both funded the plan and administered the benefits thereunder. Penn continued to serve both roles until May 1, 2003 when Penn entered into an agreement with Defendant whereby Defendant would assume the responsibility of administering the benefits which includes determining who qualifies for benefits under the plan, while Penn would only fund the plan. The terms and conditions of the plan remained the same.

The plan provides that in order to be eligible for long-term disability benefits, Plaintiff must have demonstrated an inability "to engage in any occupation appropriate to [Plaintiff] by reason of education, training and experience." [FN5] During the six years that Penn administered the plan, it routinely recertified Plaintiff's disability benefits for another year based solely on an annual update from Plaintiff's treating physician, Dan Jacobs, D.O. [FN6] Plaintiff received long-term disability benefits from April 3, 1997 through August 31, 2004.

FN5. Exhibit B to Defendant's Reply Brief in Support of Motion for Summary Judgment.

FN6. *Id.* at Exhibit D.

When Defendant began administering claims under Penn's plan in 2003, it requested that Dr. Jacobs complete an Attending Physician Statement

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



regarding Plaintiff's diagnosis, treatment, and restrictions and limitations. [FN7] Dr. Jacobs completed this form on March 8, 2004, noting that Plaintiff's primary diagnosis was degenerative disc disease, multiple herniations and bulging and spinal stenosis. Dr. Jacobs indicated that Plaintiff's secondary diagnosis was bilateral torn medial meniscus. He described Plaintiff's condition as chronic and indicated that Plaintiff would need continuing treatment. Dr Jacobs further indicated that Plaintiff was "unable to sit, stand or walk more than 15 min. Cannot climb, squat, bend or kneel due to instability in lumbar spine and both knees." Dr. Jacobs opined that Plaintiff's limitations would be "permanent." [FN8]

FN7. *Id.* at Exhibit E.

FN8. *Id.*

*2 In April 2004, Defendant sent several forms to Plaintiff to complete and return concerning his disability. Plaintiff completed only one of these forms, the Claimant Supplemental Statement, which requested information on how Plaintiff's physical condition prevents him from working. Plaintiff stated, *inter alia,* that: "I am in pretty constant pain. I can not sit or stand for any length of time, without contracting more severe pain ..." [FN9] Plaintiff also stated that he did not know when he would be able to return to part-time work and that he did not expect to return to full-time work.

FN9. *Id.* at Exhibit H.

Defendant hired an outside corporation, Commercial Index Bureau, Inc., to conduct surveillance on Plaintiff, which it did on June 15, 2004, June 16, 2004, June 25, 2004 and June 26, 2004. [FN10] No results were obtained on June 15th and June 16th. On June 25th, Plaintiff was followed as he drove from Philadelphia to a property to which he is associated in Wildwood, New Jersey. The drive lasted approximately 90 minutes.

FN10. *Id.* at Exhibit I.

The results of the video on June 25th showed that Plaintiff "move[d] about freely, showing no outward signs of disability, walking to and from his vehicle, bending inside and then walking back up the steps and returning inside." The surveillance log for June 26th showed Plaintiff sitting on his porch, moving his hands and arms in frequent gestures. "He did not appear to be wearing any corrective orthopedic devices, and did not have any walking aids nearby."

The video from June 26th showed Plaintiff standing on his porch talking to two individuals. According to the log, "[Plaintiff] occasionally bent slightly at the waist as he gestured with his hands to emphasize his speaking. He lifted his left leg and placed his foot on the arm of the chair in which he had been sitting, leaving his left leg bent at a 90-degree angle as he stood. He also placed his left arm on his knee in a resting position. He then lowered his leg and continued to gesture with his hands, before returning to his seat." The video next showed Plaintiff "walk[ing] in a normal fashion to his vehicle. He did not appear to have any difficulty in walking ... He walked back toward the residence, stepping up onto the curb with his right foot, and not appearing to have any difficulty in doing so ..."

The video next observed Plaintiff "in a standing position while appearing to swing his hips from front to back briefly as he stood with no support." He then walked to the back of his residence. Plaintiff was next observed on the second level of a separate building. According to the log, "[Plaintiff] climbed a set of wooden stairs to the third level ... He appeared to move in an easy and uninhibited manner, and did not use the railing for a large part of his ascent up the stairway." Plaintiff was later seen descending the long set of stairs without using the railing. "He threw his arms out to the side of his body and did not have any difficulty navigating the stairway to the second level. He then closed the door to a second level residence, by leaning to his right, lifting his left leg and placing all of his weight on his right leg as he also pulled the door closed. He descended the stairs from the second to the first level of the residence, placing his left hand on the railing as he came down and slid it along the railing."

*3 On July 12, 2004, Defendant requested that an investigator from another independent corporation, MJM Investigations, Inc., interview the Plaintiff. The interview took place at Plaintiff's residence in Philadelphia on July 12, 2004. [FN11] At this interview, the investigator observed the following:



Slip Copy
(Cite as: 2006 WL 328348, *3 (E.D.Pa.))

Page 3

FN11. Exhibit O to Plaintiff's Response to Defendant's Motion for Summary Judgment.

The Investigator ... observed the Claimant through the screen door, rising, one cane in each hand, in what appeared to be a difficult, off-balance, strenuous manner, from a recliner chair located near the front door....The Claimant sat back down in his recliner and laid the one cane beside him leaning on the chair ... He wore ... a brace on his left knee.[Plaintiff stated that] he suffers from severe back problems including several herniated disks in his lower back. spinal stenosis, and degenerative disk diseases. He expressed bilateral pain and discomfort in his hips and knees from arthritis. The pain is more severe in his right hip and left knee. At times, his knees will 'give out.' He has constant pain in his knees and a burning, aching feeling in his hips ... [Plaintiff] stated that he utilizes one cane when he is at home but will use two when he leaves his residence for added support ... The claimant described his limitations as 'not being able to do anything for very long.' He is able to walk, stand, ascend and descend steps, and occasionally bend at the waist but in moderation. He experiences increased pain when he attempts to bend at the waist or knees in a standing position he stated he could not lift anything over 10 pounds but in a sitting position could lift more, possibly over 20 pounds if just using his arms. He can't be on his feet too long and could walk for maybe 10-15 minutes at a time and maybe take an occasional walk around the block. [H]e stated that he needs assistance while traveling and sometimes fears traveling alone but the Investigator observed the claimant departing the residence and operating a vehicle by himself upon an unannounced visit to the residence several weeks ago. The Claimant also stated that he only uses one cane when he is at home but will take both with him when he leaves the residence. However, the Claimant was observed using both canes when the Investigator re-visited the residence to conduct the interview.

On August 2, 2004, Defendant sent Plaintiff a letter stating that Plaintiff's long-term benefits would be terminated as of August 31, 2004 because Plaintiff no longer met the definition of disability under the plan. [FN12] Plaintiff appealed the decision through counsel and on January 14, 2005, submitted additional medical documents to Defendant to consider on appeal. [FN13] Defendant informed

Plaintiff that it had referred Plaintiff's file to an independent medical examiner for a review of Plaintiff's residual functional capacity and that counsel would receive a response by May 7, 2005. [FN14] By letter dated March 2, 2005, Plaintiff's counsel submitted more recent medical records from other physicians. [FN15]

FN12. *Id.* at Exhibit P.

FN13. Exhibit J to Defendants Reply Brief.

FN14. *Id.*

FN15. *Id.* at Exhibit k.

*4 On March 3, 2005, the independent medical examiner, Defendant Carl Huff, MD, MPH, FACPM, CIME, submitted his report and opinion to Defendant. [FN16] Dr. Huff concluded that

FN16. Exhibit Q to Plaintiff's Response to Defendant's Motion for Summary Judgment.

"there is no indication that the claimant has sustained any neurologic consequence that would make him functionally disabled to work. There are many persons with degenerative disc diseases of the spine who work every day, and in the absence of neural impingement it would certainly be feasible for this man to return to a light level of work, which constitutes occasional lifting limit of 20 pounds and frequent lifting limit of 10 pounds with no restrictions on standing, walking or sitting. Also, his ability to ascend and descend stairs has already been proven. As far as his knees are concerned, he does have age related degenerative changes, but this does not interfere with his ability to walk as clearly demonstrated on the surveillance video."

On March 4, 2005, Defendant sent Plaintiff's counsel a letter stating that Defendant had upheld its decision to terminate Plaintiff's long-term disability benefits. [FN17]

FN17. *Id.* at Exhibit R.

Under ERISA, the applicable standard of review for a denial of benefits pursuant to 29 U.S.C. section 1132 depends on the actual language in the plan. When a plan grants an administrator discretionary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



authority, an administrator's factual finding and plan interpretation are reviewed under an arbitrary and capricious standard. [FN18]

> FN18. *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 438-39 (3d Cir.1997)

In the case *sub judice,* the parties agree that the plan vests discretionary authority in Defendant to decide claims. Accordingly, the Court must, as a matter of law, review the administrator's decision to deny Plaintiff benefits under the deferential arbitrary and capricious standard. [FN19] An administrator's decision is arbitrary and capricious where it is "without reason, unsupported by substantial evidence, or erroneous as a matter of law." [FN20] When considering whether an administrator's decision is arbitrary and capricious, the Court may only consider the evidence which was before the plan administrator at the time of the final decision. [FN21] Provided that the plan administrator's decision is rational, the Court is not free to substitute its own judgment for that of the plan administrator's in determining the eligibility for plan benefits even if the Court disagrees with the decision of the plan administrator. [FN22]

> FN19. Since Aetna does not have the dual role as both the entity that determines who qualifies for benefits and the entity that pays for those benefits, Judge Becker's analysis in *Pinto v. Reliance Standard Life Ins. Co.* 214 F.3d 377, 387 (3d Cir.2000) is inapplicable.

> FN20. *Abnathya v. Hoffmann-La Roche, Inc.,* 2 F.3d 40, 45 (3d Cir.1993)(internal quotations omitted).

> FN21. *Mitchell,* 113 F.3d at 440 (3d Cir.1997)

> FN22. *Mitchell,* 113 F.3d at 439; *Abnathya,* 2 F.3d at 45.

In the case *sub judice,* the plan administrator was faced with conflicting evidence concerning Plaintiff's disability. We find that Defendant's decision to terminate Plaintiff's benefits was based on Defendant's determination, supported by an independent medical evaluation (Dr. Huff) and objective observation (the surveillance video), that Plaintiff was no longer medically eligible for long-term disability benefits. Specifically, Dr. Huff opined, after reviewing Plaintiff's entire medical

history, that "there is no indication that the claimant has sustained any neurologic consequence that would make him functionally disabled to work." The surveillance video indicated that Plaintiff's physical limitations in no way matched Plaintiff's description of his limitations or the opinion of Plaintiff's treating physician, Dr. Jacobs. In view of the above, the Court cannot find that the Defendant's decision was without reason, unsupported by substantial evidence, or erroneous as a matter of law. Thus, Defendant's decision to discontinue Plaintiff's benefits was neither arbitrary nor capricious.

**\*5** Plaintiff contends that the administrator did not give proper deference to the opinion of Plaintiff's treating physician that Plaintiff was "totally disabled." Plaintiff's argument would carry some merit if the case *sub judice* involved a claim for Social Security disability benefits. However, the United States Supreme Court has held that ERISA administrators are not required to defer to doctors who have treated a claimant over those doctors who have merely reviewed a claimant's medical files. [FN23]

> FN23. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003).

Finally, Plaintiff seeks to introduce an additional medical report from Dr. Jacobs dated April 22, 2005 in an attempt to refute Defendant's decision to terminate his benefits. As noted above, however, our review is strictly limited to the record before the plan administrator at the time he rendered his decision. The Third Circuit has noted only two limited situations in which it may be appropriate to consider evidence outside the administrative record: (1) when outside evidence is needed to aid the Court in its understanding of the medical issue involved or (2) when outside evidence is needed to demonstrate potential biases and conflicts of interest that are not found in the administrator's record. [FN24] Neither of those exceptions applies to Dr. Jacob's report, which simply reasserts Dr. Jacob's opinion that Plaintiff is totally disabled.

> FN24. *Kosiba v. Merck & Co.,* 384 F.3d 58, 69 (3d Cir.2004).

For all the foregoing reasons, summary judgment is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



entered in favor of the Defendant and against the Plaintiff.

An appropriate Order follows.

### ORDER

AND NOW this 9th day of February, 2006, upon consideration of the motion of the Defendant for summary judgment [Doc. # 8] and all responses thereto, it is hereby ORDERED that:

Defendant's motion for summary judgment [Doc. # 8] is GRANTED.

Judgment is ENTERED in favor of the Defendant and against the Plaintiff.

The Clerk of Court is DIRECTED to mark this case closed for statistical purposes.

IT IS SO ORDERED.

Slip Copy, 2006 WL 328348 (E.D.Pa.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21655189 (E.D.Va.)
**(Cite as: 2003 WL 21655189 (E.D.Va.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Virginia.
Susan B. DONNELL Plaintiff.
v.
METROPOLITAN LIFE INSURANCE CO.
Defendant.
**No. Civ.A. 3:03CV180.**

Filed Feb. 21, 2003.
June 10, 2003.
John B. Mann, Levit Mann Halligan & Warren,
Richmond, VA, for Susan B. Donnell, plaintiff.

Eric W. Schwartz, Troutman Sanders LLP, Virginia
Beach, VA, for Metropolitan Life Insurance
Company, a New York corporation, defendant.

*MEMORANDUM OPINION*

SPENCER, J.

**\*1** This matter is before the Court on Plaintiffs'
Motions to Compel Discovery and Defendant's
Motion for a Protective Order in three related cases.
For the reasons discussed below, Plaintiffs' Motions
to Compel are DENIED and Defendant's Motion for
a Protective Order is GRANTED.

I.

ERISA governs these actions. 29 U.S.C. § § 1001,
et seq. Plaintiffs are participants in employee welfare
benefit plans that their former employers established
and maintained. MetLife issued the group disability
income insurance policies which insured the long
term disability benefits available to plan participants.
Plaintiffs claim they are disabled and entitled to long
term disability benefits. MetLife denied their claims.
Plaintiffs have since submitted two sets of
interrogatories and requests for production of
documents to MetLife. MetLife has objected to these
discovery requests.

Under ERISA, this Court must evaluate Plaintiffs'
claims by reviewing the administrative record to
determine whether MetLife abused its discretion in
denying the claims. MetLife has given Plaintiffs a
copy of the administrative record. As no other
evidence is admissible before this Court, discovery
would be inappropriate.

Plaintiffs are trying to dodge the governing standard
of review and limits on discovery by claiming that
Defendant has a conflict of interest by both funding
and administering the plan, which alters the standard
of review and, they claim, at least permits discovery
on the issue of Defendant's alleged conflict of
interest. However, case law has foreclosed this
avenue of discovery.

II.

Plaintiffs' only chance to get discovery beyond the
administrative record is to convince the Court that the
normal rules and standard of review do not govern
this case. Plaintiffs attempt to do that by arguing that
the abuse of discretion standard of review is modified
where the plan administrator is operating under a
conflict of interest. Plaintiffs argue that they need
discovery to validate their belief that Defendant was
operating under a conflict of interest and to establish
that the modified standard of review applies here.
However, contrary to Plaintiffs' position, case law has
left very little room for such a tactic.

Under ERISA, the district court reviews a plan
administrator's denial of benefits for abuse of
discretion when the administrator has discretion
under the plan to determine eligibility for benefits
and to construe the terms of the plan. *Firestone Tire
& Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989).
Discovery is limited in ERISA cases because trust
law principles govern, not contract law. The Supreme
Court has ruled that the trust principles are intended
to allow ERISA trustees to make determinations
largely without court intervention, which allows
employees and beneficiaries to resolve benefit claims
inexpensively and quickly. *Perry v. Simplicity Eng'g,*
900 F.2d 963, 966-967 (6th Cir.1990). Claims are
resolved more quickly if there are limits on the
admissibility of evidence and corresponding
discovery. The Fourth Circuit does not want the
federal courts to administer benefit plans instead of
the designated fiduciaries. *Berry v. Ciba-Geigy
Corp.,* 761 F.2d 1003, 1007 (4th Cir.1985).

**\*2** When the Court reviews an administrator's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

decision for abuse of discretion, the evidence is limited to the facts which were before the claim administrator when it made its decision. *Elliot v. Sara Lee Corp.,* 190 F.3d 601, 608-09 (4th Cir.1999). It would be ridiculous for the district court to find that the administrator abused its discretion by failing to consider evidence which was not before it. *Webster v. Black & Decker, Inc.,* 2002 WL 533653, *5 (4th Cir. April 10, 2002)* (unpublished opinion). Under the standard of review, discovery is not allowed because it cannot lead to admissible evidence since only the administrative record is admissible.

Plaintiff cannot get additional discovery by alleging that the plan administrator operated under a conflict of interest. Where the administrator operated under a conflict of interest, the Court weighs that conflict as a factor in whether there was an abuse of discretion. *Elliot,* 190 F.3d at 605 (4th Cir.1999). The Court's review is still limited to the administrative record. *Nessell v. Crown Life Ins. Co.,* 92 F.Supp.2d 523 (E.D.Va.2000). Otherwise, the parties will conduct far-reaching discovery in every ERISA case involving a plan administered and funded by the same entity. The expense of the litigation often would be greater than the benefits at issue. *See Newman v. Standard Ins. Co.,* 997 F.Supp. 1276, 1281 (C.D.Cal.1998). The benefits of quick and cheap resolution of ERISA claims would then be defeated.

### III.

Although MetLife's potential conflict of interest does not justify Plaintiffs' request for discovery, any conflict of interest will effect this Court's review of MetLife's denial of benefits. The Supreme Court requires this Court to weigh the conflict of interest as a factor in determining whether there was an abuse of discretion. The Fourth Circuit applies this "factor" in the following manner:

When a fiduciary exercises discretion in interpreting a disputed term of the contract where one interpretation will further the financial interests of the fiduciary, we will not act as deferentially as would otherwise be appropriate. Rather, we will review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries. In short, the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict.

*Doe v. Group Hospitalization & Medical Services,* 3 F.3d 80, 87 (4th Cir1993). The Court must appropriately weigh any conflict of interest so that

ERISA's assurance of a full and fair review is met. *Bedrick v. Travelers Ins. Co.,* 93 F.3d 149, 151 (4th Cir.1996). Furthermore, "a fiduciary with a conflict of interest must act as if he is 'free' of such a conflict. *Doe,* 3 F.3d at 87. 'Free' is an absolute. There is no balancing of interests; ERISA commands undivided loyalty to the plan participants." *Id.* at 154. Plaintiff may not have the benefit of discovery to support his allegations of a conflict of interest, but where the same entity funds and administrates the plan, that entities decision to deny benefits must appear to the Court to be in good conscience. This framework will come into play at summary judgment or at trial.

**\*3** Precedent clearly establishes that Plaintiffs are not entitled to discovery on materials outside of the administrative recored. Therefore, Plaintiffs' Motions to Compel Discovery are DENIED and Defendant's Motion for a Protective Order is GRANTED.

The Court will issue an appropriate order.

### ORDER

This matter is before the Court on Plaintiffs' Motions to Compel Discovery and Defendant's Motion for a Protective Order in three related issues. For the reasons discussed in the accompanying Memorandum Opinion, Plaintiffs' Motions to Compel are DENIED and Defendant's Motion for a Protective Order is GRANTED. Plaintiffs are not permitted discovery on materials other than the administrative record.

Let the Clerk send a copy of this Order and the accompanying Memorandum Opinion to all counsel of record.

It is SO ORDERED.

Not Reported in F.Supp.2d, 2003 WL 21655189 (E.D.Va.)

**Motions, Pleadings and Filings (Back to top)**

• 3:03CV00180 (Docket) (Feb. 21, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2006 WL 297314 (4th Cir.(Va.))
**(Cite as: 2006 WL 297314 (4th Cir.(Va.)))**

Page 1

**H**
Only the Westlaw citation is currently available.

This case was not selected for publication in the Federal Reporter.

UNPUBLISHED

Please use FIND to look at the applicable circuit court rule before citing this opinion. Fourth Circuit Rule 36(c). (FIND CTA4 Rule 36(c).)

United States Court of Appeals,
Fourth Circuit.
Susan B. DONNELL, Plaintiff--Appellant,
v.
METROPOLITAN LIFE INSURANCE
COMPANY, a New York corporation, Defendant--
Appellee.
**No. 04-2340.**

Argued Dec. 1, 2005.
Decided Feb. 8, 2006.

**Background:** Plan participant appealed from decision of the District Court for the Eastern District of Virginia, at Richmond, James R. Spencer, J., granting summary judgment to plan administrator on participant's action under the Employee Retirement Income Security Act (ERISA) to recover long-term disability benefits.

**Holding:** The Court of Appeals, Duncan, Circuit Judge held that substantial evidence supported plan administrator's conclusion that claimant's vasodepressor syncope was not disabling under terms of long-term disability plan.
Affirmed.

**[1] Labor and Employment** 690

231Hk690 Most Cited Cases
Because Employee Retirement Income Security Act (ERISA) plan administrator stood to benefit financially from a finding that participant was not disabled under the long-term disability plan, appellate court had to weigh this conflict when reviewing administrator's termination of participant's benefits, and thus, appellate court would modify the abuse of discretion standard of review by lessening it to the

degree necessary to neutralize any untoward influence resulting from the conflict. Employee Retirement Income Security Act of 1974, § 502, 29 U.S.C.A. § 1132.

**[2] Insurance** 2561(5)

217k2561(5) Most Cited Cases
The term "gainful work or service" did not exclude part-time work as that term was used in Employee Retirement Income Security Act (ERISA) long-term disability benefits plan stating that, to be disabled, claimants must be unable to perform each of the material duties of their regular job and of any "gainful work or service" for which they are reasonably qualified taking into consideration their training, education, experience and past earnings; term "gainful work or service" encompassed all work performed for income, without regard to whether it was performed full- or part-time. Employee Retirement Income Security Act of 1974, § 502, 29 U.S.C.A. § 1132.

**[2] Labor and Employment** 572

231Hk572 Most Cited Cases
The term "gainful work or service" did not exclude part-time work as that term was used in Employee Retirement Income Security Act (ERISA) long-term disability benefits plan stating that, to be disabled, claimants must be unable to perform each of the material duties of their regular job and of any "gainful work or service" for which they are reasonably qualified taking into consideration their training, education, experience and past earnings; term "gainful work or service" encompassed all work performed for income, without regard to whether it was performed full- or part-time. Employee Retirement Income Security Act of 1974, § 502, 29 U.S.C.A. § 1132.

**[3] Labor and Employment** 616

231Hk616 Most Cited Cases
Employee Retirement Income Security Act (ERISA) plan administrator's decision to terminate claimant's long-term disability benefits resulted from a process that was deliberate and principled; administrator reviewed all medical evidence that claimant submitted, measured claimant's vocational abilities, procured an independent evaluation of medical evidence, and considered all of the conditions that claimant alleged contributed to her disability, and administrator kept claimant informed of the status of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 297314 (4th Cir.(Va.))
(Cite as: 2006 WL 297314 (4th Cir.(Va.)))

her claim throughout the review. Employee Retirement Income Security Act of 1974, § 502, 29 U.S.C.A. § 1132.

## [4] Insurance ☜2578
217k2578 Most Cited Cases
Substantial evidence supported Employee Retirement Income Security Act (ERISA) plan administrator's conclusion that claimant's vasodepressor syncope was not disabling under terms of long-term disability plan; one of claimant's treating physicians for the syndrome opined that the syncope, by itself, would not prevent claimant from sitting for eight hours or walking one mile, and another of claimant's treating physicians for syncope noted that claimant's condition had stabilized and would not prevent her from working, and independent physician retained by administrator to review claimant's file agreed that the vasodepressor syncope was not disabling. Employee Retirement Income Security Act of 1974, § 502, 29 U.S.C.A. § 1132.

## [4] Labor and Employment ☜572
231Hk572 Most Cited Cases
Substantial evidence supported Employee Retirement Income Security Act (ERISA) plan administrator's conclusion that claimant's vasodepressor syncope was not disabling under terms of long-term disability plan; one of claimant's treating physicians for the syndrome opined that the syncope, by itself, would not prevent claimant from sitting for eight hours or walking one mile, and another of claimant's treating physicians for syncope noted that claimant's condition had stabilized and would not prevent her from working, and independent physician retained by administrator to review claimant's file agreed that the vasodepressor syncope was not disabling. Employee Retirement Income Security Act of 1974, § 502, 29 U.S.C.A. § 1132.

## [5] Insurance ☜2578
217k2578 Most Cited Cases
Substantial evidence supported Employee Retirement Income Security Act (ERISA) plan administrator's finding that claimant's fibromyalgia and chronic fatigue syndrome were not disabling under terms of long-term disability plan; functional capacity evaluation concluded that claimant could perform up to five hours per day of light work or six hours per day of sedentary work, and administrator also identified four job categories that were suitable to claimant's professional skills, earnings history, and physical abilities. Employee Retirement Income Security Act of 1974, § 502, 29 U.S.C.A. § 1132.

## [5] Labor and Employment ☜572
231Hk572 Most Cited Cases
Substantial evidence supported Employee Retirement Income Security Act (ERISA) plan administrator's finding that claimant's fibromyalgia and chronic fatigue syndrome were not disabling under terms of long-term disability plan; functional capacity evaluation concluded that claimant could perform up to five hours per day of light work or six hours per day of sedentary work, and administrator also identified four job categories that were suitable to claimant's professional skills, earnings history, and physical abilities. Employee Retirement Income Security Act of 1974, § 502, 29 U.S.C.A. § 1132.

## [6] Labor and Employment ☜610
231Hk610 Most Cited Cases
Federal regulation governing claims procedures did not direct ERISA plan administrators to provide claimants with a formula for obtaining benefits. 29 C.F.R. § 2560.503-1; Employee Retirement Income Security Act of 1974, § 502, 29 U.S.C.A. § 1132.

## [7] Labor and Employment ☜619
231Hk619 Most Cited Cases
Although Employee Retirement Income Security Act (ERISA) plan administrator's initial denial letter did not comply with federal regulation which required that initial denial letters advise claimants of their right to review the evidence upon which denial of benefits was based and although administrator took more than the 120 days that regulation allowed to decide claimant's appeal, these ERISA procedural violations did not warrant finding that administrator abused its discretion in terminating claimant's long-term disability benefits, absent a causal connection between procedural defects and the final denial of claim. Employee Retirement Income Security Act of 1974, § 502, 29 U.S.C.A. § 1132; 29 C.F.R. § 2560.503-1.

## [8] Labor and Employment ☜616
231Hk616 Most Cited Cases
Claimant was not entitled to conduct discovery to determine the extent to which Employee Retirement Income Security Act (ERISA) plan administrator's conflict of interest impacted its decision to terminate her long-term disability benefits since administrator's decision would survive judicial review even under the least deferential version of appellate court's modified abuse of discretion standard of review. Employee Retirement Income Security Act of 1974, § 502, 29 U.S.C.A. § 1132.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 297314 (4th Cir.(Va.))
**(Cite as: 2006 WL 297314 (4th Cir.(Va.)))**

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. James R. Spencer, District Judge. (CA-03-180-3).

**ARGUED:** John Bertram Mann, Levit & Mann, P.C., Richmond, Virginia, for Appellant. Eric Wagner Schwartz, Troutman Sanders, L.L .P., Virginia Beach, Virginia, for Appellee. **ON BRIEF:** John C. Lynch, Troutman Sanders, L.L.P., Virginia Beach, Virginia, for Appellee.

Before MOTZ and DUNCAN, Circuit Judges, and JAMES C. DEVER III, United States District Judge for the Eastern District of North Carolina, sitting by designation.

Affirmed by unpublished opinion. Judge DUNCAN wrote the opinion, in which Judge MOTZ and Judge DEVER joined.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

DUNCAN, Circuit Judge:

**\*1** Plaintiff-Appellant Susan Donnell appeals the district court's grant of summary judgment to Defendant-Appellee Metropolitan Life Insurance Company ("MetLife") on her action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) (2000), to recover long-term disability benefits in the amount of $552,922.56. For the reasons that follow, we affirm.

I.

Donnell worked as a bank credit analyst for Nations Bank until she left work in April 1995 due to the symptoms of fibromyalgia, chronic fatigue syndrome, vasodepressor syncope, and psychiatric disorders. [FN1] Soon after leaving her job, Donnell submitted a claim for long-term disability benefits to MetLife, the administrator of the Nations Bank Long-Term Disability Benefits Plan ("Plan"). MetLife approved Donnell's claim on November 2, 1995.

MetLife opened a routine review of Donnell's file on September 24, 1997. In support of her claim, Donnell forwarded to MetLife medical records from her physicians. In 1998, she participated in a vocational assessment and a functional capacity evaluation conducted at MetLife's request.

On September 24, 1998, MetLife informed Donnell that it would terminate her benefits because it had determined that she did not qualify as disabled under the Plan. Donnell appealed the decision. MetLife then commissioned Dr. Moyer, a physician not affiliated with MetLife, to review the medical evidence in Donnell's file. Dr. Moyer concluded that Donnell's medical evidence did not establish that she was disabled from full-time sedentary work.

MetLife denied Donnell's appeal on April 16, 1999. Donnell submitted to MetLife additional medical records between April and August 1999, but the insurer informed Donnell that these new submissions did not alter its decision. In February 2001, Donnell sent MetLife additional medical evidence and documentation that she had been awarded Social Security Disability Insurance ("SSDI") four years earlier in March 1997. In February 2002, Donnell submitted to MetLife a functional capacity evaluation that had been conducted in October 2001. After each of these submissions, MetLife informed Donnell that further review of her claim was not possible because her appeal had been closed since 1999.

Donnell filed suit under ERISA, 29 U.S.C. § 1132(a)(1)(B) (2000), seeking recovery of $552,922.56 in long-term disability benefits. The district court refused Donnell discovery to determine the extent of MetLife's conflict of interest in the adjudication of her claim and granted summary judgment in favor of MetLife. Donnell noted this timely appeal.

II.

This court has developed a well-settled framework for reviewing the denial of benefits under ERISA plans. We review the district court's grant of summary judgment de novo, employing the same standards applied by the district court in reviewing the administrator's decision. *Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co., 32 F.3d 120, 123 (4th Cir.1994).* Because the Plan gives the administrator discretion to determine eligibility for and entitlement to benefits, we review the administrator's decision for an abuse of that discretion, *Bernstein v. CapitalCare, Inc., 70 F.3d 783, 787 (4th Cir.1995),* "based on the facts known to [the administrator] at the time." *Sheppard & Enoch Pratt Hosp., 32 F.3d at 125.* The administrator's decision is reasonable "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Bernstein, 70 F.3d at 788* (internal quotation marks and citation omitted).

**\*2** [1] However, our standard of review is adjusted to accommodate the presence of a conflict of interest.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In exercising its discretion, MetLife operated under such a conflict because it stood to benefit financially from a finding that Donnell was not disabled under the Plan's terms. [FN2] Because we must weigh this conflict when reviewing MetLife's termination of Donnell's benefits, we modify the abuse of discretion standard of review by lessening it "to the degree necessary to neutralize any untoward influence resulting from the conflict." *Doe v. Group Hospitalization & Med. Servs.*, 3 F.3d 80, 87 (4th Cir.1993) (citation omitted); *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Stup v. UNUM Life Ins. Co.*, 390 F.3d 301, 307 (4th Cir.2004).

### III.

We begin our review by determining the circumstances under which the Plan would entitle Donnell to benefits. The Plan pays a monthly cash stipend whenever an insured is "disabled"; claimants may so qualify under any one of the Plan's three definitions. [FN3] New claimants may qualify for benefits under the first definition if they are unable to perform their regular job. For those who, like Donnell, have already received twenty-four months of benefits, a second, more rigorous definition of "disabled" applies. Such claimants must "be unable to perform each of the material duties of [their] regular job ... [and of] any gainful work or service for which [they] are reasonably qualified taking into consideration [their] training, education, experience and past earnings." J.A. 361.

[2] Donnell argues that the second definition of "disabled" entitles her to benefits if she is able to work on a part-time basis, but unable to work full-time. [FN4] She claims that the second definition's term "gainful work or service" means only full-time work or, in the alternative, that its meaning is ambiguous. While recognizing that ambiguities in ERISA plan language are construed in favor of beneficiaries, *see Bailey v. Blue Cross & Blue Shield*, 67 F.3d 53, 57 (4th Cir.1995), we agree with the district court that the term "gainful work or service" does not exclude part-time work and that this meaning is plain from the Plan's text.

When determining the meaning of ERISA plan language, we are guided by the familiar axiom that contract terms should not be construed so as to render superfluous other provisions of the agreement. *See, e.g., Tester v. Reliance Std. Life Ins. Co.*, 228 F.3d 372, 375 (4th Cir.2000) (courts construing ERISA plan terms should refer to and apply basic principles of contract law). Donnell's contention that "gainful

work or service" refers only to full-time work renders unnecessary a major portion of the Plan's third definition of "disabled." That definition provides benefits to narrow the gap between a claimant's pre-disability and post-disability earnings when she cannot perform her regular job on a full-time basis but is "performing at least one of the material duties of [her] regular job or any other gainful work or service on a part-time or full-time basis." J.A. 361. Under Donnell's interpretation of the second definition, the third definition's reference to part-time work is unnecessary. Any claimant unable to work full-time in a suitable job would qualify for disability benefits under the second definition, without regard to whether she was able to work part-time or in fact working part-time. We could adopt Donnell's interpretation and avoid finding this portion of the third definition superfluous only if we interpret it to define as "disabled" those claimants who are unable to perform their regular job full-time, who are capable of working full-time in another suitable position, and yet who choose to work only part-time. We will not distort the Plan's language to create such absurd results when the text is at least equally susceptible to the more reasonable conclusion that the term "gainful work or service" does not exclude part-time work. *See F.D.I.C. v. Prince George Corp.*, 58 F.3d 1041, 1046 (4th Cir.1995) ("[W]here one construction [of a contract term] makes the provisions unusual or extraordinary and another construction [that] is equally consistent with the language employed, would make it reasonable, fair and just, the latter construction must prevail." (citation omitted)).

*3 Furthermore, Donnell's version of the Plan's second definition of "disabled" requires us to ascribe two mutually exclusive meanings to the term "gainful work or service." A key factor in the Plan's third definition of "disabled" focuses on whether the claimant is "performing at least one of the material duties of [her] regular job or *any other gainful work or service on a part-time* or full-time basis." J.A. 361 (emphasis added). The use of "gainful work or service" in this context demonstrates that the term, as used in the third definition, encompasses all work performed for income, without regard to whether it is performed full- or part-time. We will not assign a different meaning to the second definition's use of the same term.

For the reasons outlined above, we conclude that the Plan's second definition of "disabled" applies only to claimants who are unable to perform any full-time or part-time work for which they are reasonably

qualified based on their training, education, experience, and past earnings. Donnell's claim for benefits must demonstrate that she meets these criteria.

### IV.

We turn now to our review of MetLife's determination that Donnell was not disabled under the Plan's second definition, which requires in relevant part that a claimant be "unable to perform each of the material duties of any gainful work or service for which [she is] reasonably qualified taking into consideration [her] training, education, experience and past earnings." [FN5] J.A. 361. To survive abuse of discretion review, MetLife's termination of Donnell's benefits must have been reasonable. *See Stup*, 390 F.3d at 307. A reasonable decision is "the result of a deliberate, principled reasoning process" and is "supported by substantial evidence." [FN6] *See id.* (citations omitted). As we have noted, judicial review of the reasonableness of MetLife's decision is limited to the body of evidence before the administrator at the time it rejected Donnell's claim. *See, e.g., Elliot v. Sara Lee Corp.*, 190 F.3d 601, 608-09 (4th Cir.1999).

### A.

[3] MetLife's decision to terminate Donnell's disability benefits resulted from a process that was deliberate and principled. The company's decisionmaking process included a genuine and thorough consideration of all the evidence before it. It reviewed all medical evidence that Donnell submitted, measured Donnell's vocational abilities, procured an independent evaluation of the medical evidence, [FN7] and considered all of the conditions that Donnell claimed contributed to her disability. Furthermore, MetLife kept Donnell informed of the status of her claim throughout the review, notifying her of its decision on initial review to terminate her benefits, of its decision on appeal to uphold the termination, of its decisions not to reverse its denial of her appeal in light of additional evidence that she submitted in 1999, and of its refusals to re-open her appeal in 2001 and 2002.

*4 These procedures comport with those we have previously found to be deliberate and principled. *See, e.g., Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 344-45 (4th Cir.2000) (decision based on "numerous" evaluations by independent doctors and claimant-submitted evidence was the result of a principled and reasonable process); *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 233-34 (4th Cir.1997) (decision based on

independent and claimant-submitted medical evidence and resulting from a "lengthy and thorough" evaluation was the product of a deliberate, principled reasoning process). Likewise, these procedures do not suffer from the infirmities that we have identified as fatal on abuse of discretion review. *See, e.g., Johannssen v. Dist. No. 1--Pac. Coast Dist. MEBA Pension Plan*, 292 F.3d 159, 177-78 (4th Cir.2002) (benefits decision based on interpretations of plan terms that render text superfluous, or disregard plain meaning was not the product of a deliberate or principled decisionmaking process).

Having concluded that MetLife's decision was the result of a deliberate and principled decisionmaking process, we now proceed to consider whether that decision was supported by substantial evidence.

### B.

Substantial evidence is the quantum and quality of relevant evidence that is more than a scintilla but less than a preponderance and that "a reasoning mind would accept as sufficient to support a particular conclusion." *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir.1984), *overruled by implication on other grounds by Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003); *see also United Seniors Ass'n v. Social Sec. Admin.*, 423 F.3d 397, 404 (4th Cir.2005).

[4] Substantial evidence supports MetLife's conclusion that Donnell's vasodepressor syncope was not disabling under the Plan's terms. In 1997, one of Donnell's treating physicians for the syndrome opined that the syncope, by itself, would not prevent her from sitting for eight hours or walking one mile. In 1999, another of Donnell's treating physicians for the syncope noted that Donnell's condition had stabilized and would not prevent her from working. Dr. Moyer, the independent physician retained by MetLife to review Donnell's file, agreed that the vasodepressor syncope was not disabling.

[5] Substantial evidence likewise supports MetLife's finding that Donnell's fibromyalgia and chronic fatigue syndrome were not disabling under the Plan's second definition. [FN8] The 1998 functional capacity evaluation concluded that Donnell could perform up to five hours per day of light work or six hours per day of sedentary work. MetLife also identified four job categories that were suitable to Donnell's professional skills, earnings history, and physical abilities. [FN9]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 6
Slip Copy, 2006 WL 297314 (4th Cir.(Va.))
**(Cite as: 2006 WL 297314 (4th Cir.(Va.)))**

In light of the above, MetLife was not unreasonable in finding that Donnell was not "unable to perform each of the material duties of any gainful work or service for which [she is] reasonably qualified taking into consideration [her] training, education, experience and past earnings." J.A. 361. We therefore find that MetLife did not abuse its discretion when it terminated Donnell's long-term disability benefits.

## V.

*5 Donnell also charges that MetLife violated procedural regulations governing benefits claims under ERISA plans and that these violations constituted an abuse of discretion. She claims that MetLife's initial termination letter violated 29 C.F.R. § 2560.503-1 by failing to outline the evidence necessary to perfect her appeal or to inform her of her right to review the administrative record. She claims that MetLife further violated Section 2560.503-1 by deciding her appeal outside the regulation's 120-day timeline.

[6][7] None of these arguments persuades us to find that MetLife abused its discretion in terminating Donnell's benefits. First, as we have previously held in the very case that Donnell cites to support her arguments, Section 2560.503-1 does not direct ERISA plan administrators to provide claimants with a formula for obtaining benefits. _Ellis,_ 126 F.3d at 235-36. Second, MetLife's initial denial letter [FN10] substantially complied with Section 2560.503-1's requirement that such letters outline the steps that a claimant must take to obtain review. _See_ 29 C.F.R. § 2560.503- 1(g)(1)(iv) (2005); _Ellis,_ 126 F.3d at 235 & n. 5 (holding that language nearly identical to that in MetLife's initial denial letter to Donnell satisfied the regulation's requirements). Finally, Donnell is correct that MetLife's initial denial letter does not comply with this circuit's interpretation of Section 2560.503-1 to require that initial denial letters advise claimants of their right to review the evidence upon which the denial of benefits was based. _See Ellis,_ 126 F.3d at 237. She is also correct that MetLife took more than the 120 days that Section 2560.503-1 allows to decide her appeal. _See_ 29 C.F.R. § 2560.503-1(i)(1)(I) (2005). However, we have made clear that we will not find an abuse of discretion based on ERISA procedural violations absent "a causal connection between [procedural defects] and the final denial of a claim." _Ellis,_ 126 F.3d at 238. Donnell has asserted no such link between MetLife's noncompliance with Section 2560.503- 1 and the denial of her claim, and we accordingly do not disturb our finding that MetLife did not abuse its discretion.

## VI.

[8] Finally, Donnell argues that the district court erred in refusing to allow her to conduct discovery to determine the extent to which MetLife's conflict of interest impacted its decision. We cannot agree.

First, our precedent has established modification of the abuse of discretion standard of review as the method by which courts may take account of any conflict of interest that may have tainted the administrator's decision. _See, e.g., Stup,_ 390 F.3d at 307; _Bernstein,_ 70 F.3d at 788; _Doe,_ 3 F.3d at 87; _see also Firestone,_ 489 U.S. at 115. We concur with the district court's assessment that MetLife's decision would survive judicial review even under the least deferential version of our modified abuse of discretion standard of review. As we have explained, Donnell has shown no deficiencies, in either MetLife's decisionmaking process or the evidence supporting its actions, that might make us reluctant to uphold the company's decision under a less deferential abuse of discretion standard of review. Thus, even assuming that discovery would uncover a bias that would warrant modifying our abuse of discretion standard of review to the fullest extent that our jurisprudence allows, such evidence would not affect our conclusion that MetLife's decision was reasonable. We therefore see no error in refusing Donnell the opportunity to conduct discovery on an issue that is irrelevant to the ultimate outcome of her claim.

*6 Second, even in ERISA actions in which courts review the administrator's decision de novo, introduction of evidence outside the administrative record is permitted only in exceptional circumstances. _Quesinberry v. Life Ins. Co. of N. Am.,_ 987 F.2d 1017, 1026-27 (4th Cir.1993). Where, as here, a court reviews an administrator's decision under a deferential standard, discovery and introduction of extrinsic evidence pertaining to the "mental processes of the plan's administrator" are generally, if not uniformly, disallowed. _See Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan,_ 195 F.3d 975, 981-82 (7th Cir.1999). Donnell has presented no reason to warrant our deviation from these principles.

## VII.

Because MetLife's decision was reasonable, we find that it did not abuse its discretion when it terminated Donnell's long-term disability benefits. Accordingly, the judgment of the district court is
    _AFFIRMED._

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 297314 (4th Cir.(Va.))
**(Cite as: 2006 WL 297314 (4th Cir.(Va.)))**

FN1. Fibromyalgia is "a common condition characterized by widespread pain in joints, muscles, tendons, and other soft tissues ... [and by] fatigue, morning stiffness, sleep problems, headaches, numbness in hands and feet, depression, and anxiety." U.S. Nat'l Library of Med., MedlinePlus: Fibromyalgia, *at* http:// www.nlm.nih.gov/medlineplus/ency/article/ 000427.htm (Apr. 26, 2004). Chronic fatigue syndrome is "a condition of prolonged and severe tiredness or weariness ... that is not relieved by rest and is not directly caused by other conditions." U.S. Nat'l Library of Med., MedlinePlus: Chronic Fatigue Syndrome, *at* http://www.nlm.nih.gov/medlineplus/ency/a rticle/001244.htm (June 22, 2004). Vasodepressor syncope is the "temporary loss of consciousness and posture, described as 'fainting' or 'passing out.' ' Am. Heart Ass'n, Syncope, *at* http://www.americanheart.org/presenter.jht ml? identifier=4749 (last visited Jan. 18, 2006).

FN2. MetLife is compensated by a fixed premium from Nations Bank, from which it pays its claims. MetLife will therefore be the recipient of the savings resulting from a decision not to pay Donnell further benefits. *See Doe v. Group Hospitalization & Med. Servs.,* 3 F.3d 80, 87 (4th Cir.1993) (noting that a conflict of interest exists when "one interpretation [of the plan] will further the financial interest of the [insurer]").

FN3. The Plan defines "disability" or "disabled" as follows:
[D]ue to an Injury or Sickness, you require the regular care and attendance of a Doctor (unless, in the opinion of a Doctor, future or continued treatment would be of no benefit) and:
1. you are unable to perform each of the material duties of your regular job; and
2. after the first 24 months of benefit payments, you must also be unable to perform each of the material duties of any gainful work or service for which you are reasonably qualified taking into consideration your training, education, experience and past earnings; or
3. you, while unable to perform all of the

material duties of your regular job on a full-time basis, are:
a. performing at least one of the material duties of your regular job or any other gainful work or service on a part-time or full-time basis; and
b. earning currently at least 20% less per month than your Basic Monthly Earnings due to that same Injury or Sickness.
J.A. 361.

FN4. Although Donnell's primary argument asserts that she qualifies as "disabled" under the Plan's second definition, she claims in the alternative that her eligibility for benefits should be measured under the Plan's third definition of "disabled." We do not agree. A key element of the third definition requires claimants to be "performing at least one of the material duties of [their] regular job or any other gainful work or service on a part-time or full-time basis." J.A. 361. Under this definition, the Plan's clear language classifies as "disabled" only those who in fact are working in some capacity. Because Donnell was not working at any time relevant to her claim, this third definition of disability by its terms does not apply to her.

FN5. The second definition also requires claimants to be "unable to perform each of the material duties of [their] regular job," J.A. 361, but the parties on appeal have focused their arguments on whether Donnell satisfies the second definition's companion requirement that she be unable to perform any job for which she is reasonably qualified.

FN6. This court has alternatively framed reasonableness as an open-ended inquiry that may, in addition to other relevant issues, consider the following eight factors: "(1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have." *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan,* 201 F.3d 335, 342-43 (4th Cir.2000). We have never explicitly overruled *Booth's* facially more expansive test of reasonableness. Recent decisions have embraced both standards. *Compare Stup,* 390 F.3d at 307 (defining reasonable decisions as those that are "the result of a deliberate, principled reasoning process" and that are "supported by substantial evidence" (citations omitted)), *with McCoy v. Holland,* 364 F.3d 166, 170 (4th Cir.2004) (holding that courts "may consider many factors in determining the reasonableness of a fiduciary's discretionary decision" (citing *Booth,* 201 F.3d at 342-43)). We reconcile the two lines of cases by viewing the *Booth* factors as more particularized statements of the elements that constitute a "deliberate, principled reasoning process" and "substantial evidence" and of the reasons for applying a modified abuse of discretion standard of review.

FN7. Donnell claims that Dr. Moyer's evaluation of her medical evidence was biased due to his affiliation with a firm that markets its medical review services to disability insurers, but she has pointed to no evidence suggesting that this affiliation unduly influenced either Dr. Moyer's or MetLife's review of the medical evidence.

FN8. We do not consider the findings of the 2001 functional capacity evaluation or Donnell's award of SSDI benefits because that evidence was not before MetLife when it rendered its decision. As we have noted, MetLife's decision must stand or fall based on the evidence that was before it at the time. *See, e.g., Elliot,* 190 F.3d at 608-09.

FN9. No evidence in the record suggests that the occupations that MetLife identified were unsuitable for Donnell because she is able to work only six hours per day. Donnell has the burden to prove that she is entitled to receive disability benefits under the Plan. *See Ruttenberg v. U.S. Life Ins. Co.,* 413 F.3d 652, 663 (7th Cir.2005) (ERISA plaintiffs must prove that their insurance contract entitles them to benefits); *Band v. Paul*

*Revere Life Ins. Co.,* 14 Fed. Appx. 210, 212 (4th Cir.2001) (per curiam) (unpublished) (ERISA plaintiffs must prove that they are entitled to benefits under their insurance plan); *cf. Gable v. Sweetheart Cup Co.,* 35 F.3d 851, 855 (4th Cir.1994) (ERISA plaintiffs have the burden to prove that their plan promised to provide vested benefits). Because Donnell failed to offer evidence that the identified occupations were unsuitable for part-time workers, MetLife did not act unreasonably in relying upon its vocational assessment to conclude that Donnell was not disabled from those occupations.

FN10. MetLife's initial denial letter of September 24, 1998, states in relevant part: "You may file a written request for review of your claim within 60 days of receipt of this letter. This request should be directed [to MetLife at a given address]. When requesting this review, you should state the reason you believe the claim was improperly denied and submit any additional medical information or facts, data, questions or comments which you deem appropriate and important for us to give your appeal proper consideration. Metropolitan Life will re-evaluate all the data and you will be informed in a timely manner of our decision." J.A. 891.

Slip Copy, 2006 WL 297314 (4th Cir.(Va.))

END OF DOCUMENT

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
**Tammany HOOVER Plaintiff,**
v.
**METROPOLITAN LIFE INSURANCE
COMPANY a/k/a Met Disability And Warner-
Lambert
Company
No. Civ.A. 05-4323.**

Feb. 14, 2006.
Jon C. Lyons, Lancaster, PA, for Tammany
Hoover.

Veronica W. Saltz, Saltz Polisher, PC, Wayne, PA,
for Metropolitan Life Insurance Company and
Warner-Lambert Company.

*MEMORANDUM*

DIAMOND, J.

**\*1** Plaintiff Tammany Hoover moves for summary
judgment, seeking reinstatement of her long-term
disability benefits under the Employee Retirement
Income Security Act. *See* 29 U.S.C. § 1001 et seq.
The Disabilities Plan Administrator also moves for
summary judgment, arguing that the undisputed
evidence shows that its decision to terminate benefits
was not arbitrary and capricious. I agree with the
Administrator and so grant summary judgment in its
favor. I deny Plaintiff's motion.

*LEGAL STANDARDS*

Upon motion of any party, summary judgment is
appropriate "if there is no genuine issue as to any
material fact and the moving party is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(c).
The moving party must initially show the absence of
any genuine issues of material fact. *See Celotex
Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91
L.Ed.2d 265 (1986). An issue is material only if it
could affect the result of the suit under governing
law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S.
242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In
deciding whether to grant summary judgment, the
district court "must view the facts in the light most
favorable to the non-moving party," and take every
reasonable inference in that party's favor. *Hugh v.*

*Butler County Family YMCA,* 418 F.3d 265 (3d
Cir.2005). If, after viewing all reasonable inferences
in favor of the non-moving party, "the record taken
as a whole could not lead a rational trier of fact to
find for the non-moving party, there is no genuine
issue for trial," and summary judgment is
appropriate. *Matsushita Elec. Indus. Co. v. Zenith
Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348,
89 L.Ed.2d 538 (1986); *Delande v. ING Employee
Benefits,* 112 Fed. Appx. 199, 200 (3d Cir.2004). A
grant of summary judgment thus "avoid[s] a
pointless trial in cases where it is unnecessary and
would only cause delay and expense." *Walden v.
Saint Gobain Corp.,* 323 F.Supp.2d 637, 641
(E.D.Pa.2004) (restating *Goodman v. Mead
Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976)).

Having cross-moved for summary judgment, both
sides agree that there are virtually no material facts
in dispute. Given my decision to grant summary
judgment in favor of the Administrator, however, in
describing the background of this case, I have
construed the undisputed facts in the light most
favorable to Plaintiff. Where the parties disagree on
immaterial facts--such as the precise dates on which
certain events occurred--I have adopted the
Plaintiff's characterization of these facts. *See Butler
County,* 418 F.3d at 267.

*BACKGROUND*

Plaintiff Tammany Hoover worked as a secretary
for Defendant Warner-Lambert Company from June
2, 1986 until August 26, 2001. (R.430, 439).
Sometime after 1998, Plaintiff began to receive
treatment from her family practitioner, Jenifer
Bruner, for various conditions, including chronic
fatigue, headaches, body/muscle aches, joint pain,
depression, cognitive problems, and skin rashes. (
*Pl. Memo. in Support of S.J.* at 2, R. 264). After
Plaintiff stopped working in August, 2001, she
received short-term disability benefits. (*Pl. Memo.*
at 2).

**\*2** While employed by Warner-Lambert, Ms.
Hoover received coverage under Warner-Lambert's
Long Term Disabilities Plan, administered by
Defendant Metropolitan Life and funded by Warner-
Lambert. (R.19, R.44-47). The Plan defines total
disability as:
The complete inability of an Employee to perform
substantially all of the material duties of his or her

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
(Cite as: 2006 WL 343223, *2 (E.D.Pa.))

Page    2

regular occupation as it is generally performed in
the national economy, or perform another
occupation for which the Employee is qualified and
can earn at least 75% of pre-disability
Compensation. The Covered Employee cannot
engage in any other employment except as provided
under the rehabilitation program described in
Article 14.
(R. 9, 26). The Plan confers on MetLife
discretionary authority to determine entitlement to
benefits. (R.47). To that end, MetLife also has
authority to require claimant "to furnish such
information as it may request for the purpose of the
proper administration of claims, including benefit
appeals ... including medical evidence, satisfactory
to MetLife, of the nature, extent and continuation of
any illness or disability...." (R.48). Finally, the
Plan contains specific limitations of eligibility,
including:

Notwithstanding any other provisions of this Plan,
no benefits shall be payable hereunder with respect
to a Total Disability:
(a) resulting from an injury or sickness for which
the Covered Employee is not treated by a duly
qualified physician or fails to furnish proof of such
treatment to MetLife.
(R.32).

After leaving Warner-Lambert, Plaintiff was
diagnosed on December 10, 2001 with "probable
systemic lupus," a disease that rheumatologist Dr.
Thomas Kantor linked to fatigue and fibromyalgia.
(R.367). On January 3, 2002, Dr. Kantor reported
that Plaintiff could sit for only one hour
intermittently, and stand or walk for fifteen minutes
intermittently. (R.431, 435). Plaintiff filed her
initial claim for long-term disability benefits on that
same day, and the Plan began paying long-term
disability benefits on February 27, 2002. (R.429-
430). MetLife's electronic diary for Plaintiff's case
shows that between February 27 and May 14, 2002,
MetLife repeatedly asked for a number of Plaintiff's
medical records; she gradually provided them.
(R.68-72).

MetLife approved Plaintiff's claim on May 14,
2002, noting that, "given the multiple diagnosis, it
is reasonable to assume that fatige [sic] and pain are
currently sufficiently severe to preclude any occ."
(R.71-72). MetLife also noted, however, that
"improvement is expected" in Plaintiff's condition.
*Id.*

On February 25, 2004, MetLife telephoned
Plaintiff seeking any post-February 13, 2003,
treatment records--documents the Plan obligated
Plaintiff to provide. (R.78). MetLife repeated this
request in a letter dated March 3, 2004, emphasizing
that it also needed to receive a Medical
Authorization and a Personal Profile Questionnaire.
(R.308). Although MetLife soon began receiving
the treatment records, it did not receive the
Authorization and Profile, and so followed up with
telephone and letter requests. Plaintiff did not
complete these documents and provide them to
MetLife until April 24, 2004. (R.289, 299). In the
Questionnaire, Plaintiff stated that she suffered from
"joint pain, chronic fatigue, inability to concentrate,
severe headaches, depression, anxiety," and
sleeplessness. (R.283-87). She also reported that her
daily routine included a "shower, laundry when
needed, mail, [and] organization of home." She
identified laundry, vacuuming, dusting, and
"shopping when someone can come with me" as
housework she regularly performed. *Id.* In addition,
she listed walking, reading, television, and
computer usage among her daily activities. *Id.*

*3 In response to its requests for Plaintiff's medical
records, MetLife received a number of documents,
including two Attending Physician Statements from
Dr. Lisa S. Allen. The first, dated March 11, 2004,
stated that Plaintiff was capable of sitting for eight
hours continuously, and performing climbing,
twisting, bending, stooping, eye/hand, and
repetitive fine finger movements. (R.292). Dr.
Allen's second statement, dated April 23, 2004,
indicated that Plaintiff could sit, stand, or walk for
up to one hour and occasionally lift up to ten
pounds. (R.303).

On August 9, 2004, MetLife referred Plaintiff's
claim to a nurse consultant to evaluate whether there
was sufficient information to support a continued
determination of total disability. (R.81). On August
26, 2004, the nurse consultant recommended that
MetLife obtain additional information from
Plaintiff's doctors. On November 5, 2004, Dr.
Allen completed a questionnaire at the request of
MetLife. Dr. Allen stated she saw Plaintiff every
three to four months, and that Plaintiff's symptoms
included cognitive problems, headache, and fatigue.
(R.275).

In a December 1, 2004 letter, MetLife notified

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy

**(Cite as: 2006 WL 343223, \*3 (E.D.Pa.))**

Page 3

Plaintiff it was disqualifying her for long-term benefits, and noted several bases for its decision:

  You must be under the "regular care" of a health care provider to remain qualified for long term disability benefits. This means you must receive medical treatment or services from a licensed health care provider who is most appropriate to treat the medical condition. Once long term disability benefits begin, you must continue to receive generally accepted medical treatment for the condition, including regular visits to a health care provider ...

  Per a 4/23/04 attending physician statement Dr. Allen indicated you can sit/stand/walk 1 hour each continuously, you can lift/carry up to 10 pounds occasionally and that you have persistent pain.... The information in file shows you have complaints of fatigue and pain and that you are capable of activities of daily living. The information in file does not show objective testing or support for cognitive problems or fatigue or support for a disability of such a severity as to preclude you from doing your own job or any other occupation you may be qualified for.

  (R.273-74).

Plaintiff appealed the termination on January 19, 2005, by writing a letter to MetLife's appeals unit. (R.258). MetLife acknowledged receiving her letter on February 3, 2005, and referred Plaintiff's file for review by two independent physician consultants: Dr. Mark R. Burns and Dr. Charles G. Bellville. (R.254- 57).

Dr. Burns is a New York-licensed physician with board certifications in internal medicine and rheumatology. (R.252-50). On February 15, 2005, he issued a report summarizing the medical records provided by the Plaintiff. *Id.* Dr. Burns found in part that:

  While the patient complains of joint and muscle pain[,] the only physical findings recorded are multiple trigger points. There is no documentation of actual synovitis or of any loss of muscle function....

  \*4 In summary, the patient has a lupus-like disorder along with depression, pseudotumor cerebri, osteoarthritis of the knees, and fibromyalgia. Review of the medical records from 2004 fails to find documentation of any objective physical limitations. The claimant has muscle trigger points but no other signs of limitation in

muscle function. There are the claimant's self-reported symptoms of pain and fatigue. There are also complaints of cognitive dysfunction without any documentation to support this. There's no evaluation of the claimant's depression....

  [T]he records do not contain any documentation of physical impairments that would have prevented the claimant from working in her own light occupation.

  *Id.* After reviewing the evidence, Dr. Burns concluded that although Plaintiff "would need the opportunity to take breaks," there were "no impairments documented that would preclude employment." *Id.*

Dr. Bellville is an Oregon-licensed physician with a board certification in psychiatry. (R. 243-45). MetLife sought Dr. Bellville's advice as to whether Plaintiff had "any mental impairment that would have prevented [her] from working in her own occupation as of 12/31/04." *Id.* Dr. Bellville first observed that Plaintiff provided no record "of a psychological or psychiatric evaluation." He also found that the records from her doctors "are not sufficient enough in the area of psychological and cognitive functioning to draw conclusions about the presence of a mental impairment." *Id.* Dr. Bellville made particular note of the absence of "objective testing," such as a "mental status examination," before concluding that there was no documentation "to suggest that a mental impairment would have prevented her from working, especially as of December 31, 2004." *Id.*

On February 22, 2005, after reviewing the reports from Dr. Bellville and Dr. Burns, MetLife denied Plaintiff's appeal. (R. 246-50). In its notification letter, MetLife restated the eligibility requirements, Plaintiff's medical history, and the findings of Dr. Bellville and Dr. Burns, before concluding that the evidence "failed to support a severity of impairment that would preclude you from gainful employment." *Id.*

Plaintiff filed this action on August, seeking a declaration of her rights under the Plan, and asking me to compel MetLife to reinstate her long-term disability benefits as of December 31, 2004. At the close of discovery, Plaintiff and Defendants both moved for summary judgment, and I heard oral argument on January 23, 2006. I now grant summary judgment in favor of MetLife and Warner-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                      **Page 4**
**(Cite as: 2006 WL 343223, *4 (E.D.Pa.))**

Lambert.

### DISCUSSION
I. MetLife's Decision May Be Overturned Only If
It Was Arbitrary and Capricious.

Courts review a denial of ERISA benefits *de novo*
except when the plan confers discretionary authority
on its administrator to determine eligibility or to
construe the plan's terms. *Firestone Tire & Rubber
Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948,
103 L.Ed.2d 80 (1989). As I have shown, the
Warner-Lambert Long Term Disabilities Plan grants
discretionary authority to MetLife over both
eligibility determinations and plan term
construction. Accordingly, I must "review the
administrator's exercise of that authority under an
'arbitrary and capricious' standard." *Vitale v.
Latrobe Area Hosp. .,* 420 F.3d 278, 281-82 (3d
Cir.2005) (quoting *Orvsoh v. Program of Group
Ins. for Salaried Employees of Volkswagen of Am.,
Inc.,* 222 F.3d 123, 129 (3d Cir.2000)). Under this
standard, I may overturn MetLife's decision if "it is
without reason, unsupported by substantial evidence
or erroneous as a matter of law." *Lasser v. Reliance
Std. Life Ins. Co.,* 344 F.3d 381, 384 (3d Cir.2003)
.

**\*5** Plaintiff argues unpersuasively for less deference
and a heightened standard of review, noting that the
Third Circuit has authorized a "sliding scale" of
declining deference in ERISA cases where the
decision-maker faced a structural conflict of interest.
*Pinto v. Reliance Std. Life Ins. Co.,* 214 F.3d 377,
383 (3d Cir.2000). Plaintiff argues that I should
employ a "sliding scale" here because: 1) MetLife
"may well have a degree of structural conflict or
financial interest in the outcome of its claims
handling practices," and 2) MetLife's termination
decision is a "suspicious event[ ]" that warrants
heightened review even absent a financial conflict.
*See* Pl. Memo at 9.

Plaintiff's argument fails on both counts. The
authority Plaintiff offers underscores that no conflict
exists here. Warner-Lambert funds the Plan, but
MetLife makes all eligibility decisions. This
arrangement ensures that MetLife suffers no
financial consequences from its decisions. At oral
argument, Plaintiff's counsel admitted as much,
stating that the only "financial conflict" Plaintiff
alleges is "insubstantial": the interest in "pleasing

their customer." *Jan. 23, 2006 Tr.* at 6. The Third
Circuit has rejected Plaintiff's rationale, holding that
where an employer "fund[s] a plan and pay[s] an
independent third party to interpret the plan and
make plan benefits determinations," there is no
financial conflict of interest. *Pinto,* 214 F.3d at 383;
*see also Vitale* 420 F.3d at 281-82; *Cerneskie v.
Mellon Bank Long Term Disability Plan,* 142 Fed.
Appx. 555, 557 (3d Cir.2005). Were it otherwise,
the administration of every ERISA plan would be
fraught with allegations of "insubstantial" financial
conflicts, triggering a heightened standard of review
in all instances. This would effectively eliminate the
deferential standard of review required by the
Supreme Court in *Firestone.*

Plaintiff alleges a second structural conflict: a
$2822 payment from MetLife or Warner-Lambert to
ALLSUP, a company that helped Plaintiff obtain her
Social Security benefits. Plaintiff does not explain
how a fee paid by MetLife to help Plaintiff use
ALLSUP's services to qualify for Social Security
can create a structural conflict.

Plaintiff misreads Third Circuit authority in arguing
that I should apply heightened scrutiny even if I do
not find a conflict of interest. For instance, in
Plaintiff's view, *Kosiba v. Merck & Co.* requires me
to use the "sliding scale" approach and determine
whether to apply a heightened standard of review
"even absent an inherent conflict." *See* 384 F.3d 58
(3d Cir.2004). Yet in *Kosiba,* there was a conflict of
interest--Defendant Merck was the funder *and* had
"ultimate administrative authority" over the
company's long-term disabilities plan. *Kosiba,* 384
F.3d at 66.

Plaintiff similarly misreads *Pinto* as requiring
heightened review even where "there is no evidence
of an inherent structural conflict." Pl. Memo at 10.
As the *Pinto* Court described, however, a conflict
existed because the same entity--an insurance
company--had the authority "to fund, interpret, and
administer a plan." 214 F.3d 377, 383. Following
*Kosiba,* the Third Circuit has continued to apply the
sliding scale only when a structural conflict exists.
*See Vitale,* 420 F.3d at 281-82, n. 2; *Sommer v.
Prudential Ins. Co. of Am.,* 138 Fed. Appx. 426,
427 (3d Cir.2005) (*Pinto* and *Firestone* authorize
heightened scrutiny "only if there is good reason to
suspect self-dealing on the part of the
decisionmaker"); *Bader v. RHI Refractories Am.,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



*Inc.,* 111 Fed. Appx. 117 (3d Cir.2004).

 *6 In these circumstances, Plaintiff's request for heightened scrutiny is contrary to the law of this Circuit. Accordingly, I apply a deferential standard of review to MetLife's decisions.

 II. Substantial Evidence Supports MetLife's Final Decision.

 In applying a "substantial evidence" or arbitrary and capricious standard, I determine whether "there is sufficient evidence for a reasonable person to agree with the decision." *Courson v. Bert Bell NFL Player Retirement Plan,* 214 F.3d 136, 142 (3d Cir.2000). A decision may be supported by substantial evidence even where the record also includes contradictory evidence. *See Johnson v. UMWA Health & Retirement Funds,* 125 Fed. Appx. 400, 403 (3d Cir.2005) (a court analyzing an ERISA decision "should affirm [the decision] as long as it is supported by substantial evidence in the record, even if the record also contains substantial evidence that would support a different result").

 As MetLife stated in its December 1, 2004 letter, it terminated Plaintiff's benefits because: 1) she was not under the regular care of an appropriate, licensed health care provider; 2) her physical limitations had lessened since MetLife had approved her long-term benefits in February, 2002; 3) she was able to perform myriad "daily living" tasks--activities that are inconsistent with long-term disability; and 4) there was no "objective testing" or other medical support for Plaintiff's complaints of "cognitive problems or fatigue." (R. 273- 74). The record shows substantial evidence supports these determinations.

 First, there is considerable evidence confirming that Plaintiff no longer suffered from physical limitations that prevented her re-employment. In sharp contrast to Dr. Kantor's 2002 evaluation that Plaintiff could not even sit intermittently for longer than an hour and stand or walk intermittently for longer than 15 minutes, Dr. Allen reported on April 23, 2004 that Plaintiff could now engage in all those activities continuously for 1 hour. Dr. Allen's March 11, 2004 report was more optimistic still, finding that Plaintiff could now sit for eight hours continuously.

 Plaintiff's self-reporting reinforced Dr. Allen's

descriptions of significant improvement in her condition. For example, in her January 3, 2002 self-evaluation, Plaintiff reported that she could not vacuum or dust, and had hired a helper to do those activities. (R. 436). In her April 24, 2004 profile, however, Plaintiff described her participation in housework and daily activities, including laundry, vacuuming, dusting, walking, reading, and watching television. Like Dr. Allen's reports, Plaintiff's representations show significant improvement in her condition.

 The record also shows that Dr. Burns had concluded that "there are no impairments documented that would preclude employment." Dr. Burns similarly observed that many of Plaintiff's alleged conditions, such as cognitive dysfunction and fatigue, were completely undocumented.

 *7 In addition, MetLife had received Dr. Bellville's analysis, highlighting the total lack of medical evidence that Plaintiff suffered from, or had received treatment for, any mental impairment. Dr. Bellville concluded that, in the absence of a "mental status examination" or other "objective testing," there simply was no "documentation ... to suggest that a mental impairment would have prevented [Plaintiff] from working."

 Finally, MetLife noted in the December 1, 2004 letter that Dr. Allen-- Plaintiff's own attending physician--reported that in the preceding fifteen months, Plaintiff visited her office on just four occasions: September 10, 2003; December 9, 2003; April 20, 2004; and August 10, 2004. This infrequent treatment is confirmed by Dr. Allen's November 5, 2004 notation that Plaintiff received treatment approximately every "3-4 months." Both the letter and the Plan itself provide that beneficiaries must be receiving medical treatment and be under the regular care of a health care provider to remain eligible for benefits. (R.25, 273). Plaintiff's record of infrequent treatment suggests that she was not receiving the regular care that would normally accompany a total disability. *See Rosenberg v. Guardian Life Ins. Co. of Am.,* 2002 U.S. Dist. LEXIS 24683 (S.D.N.Y.2002) (holding that to receive regular treatment, a claimant must "consult with a physician more than sporadically").

 Despite this substantial evidence supporting

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



MetLife's decision to terminate, Plaintiff argues that the decision was arbitrary and capricious. I find these arguments unpersuasive because they misapprehend the facts of this case and misconstrue the applicable law.

First, Plaintiff alleges that a termination of benefits is *per se* arbitrary and capricious in the absence of evidence "that [her] condition has changed." *See Pl. Mem.* at 15; *see also Tr. of Jan. 23, 2006 Hearing* at 3 (citing the fact that the "medical evidence from her treating sources [ ] is very consistent" as a reason it is arbitrary and capricious). Yet the evidence here--much of it from Plaintiff herself--shows that Plaintiff's condition *had* changed. Dr. Allen and Plaintiff reported improvements in Plaintiff's capacity to sit, stand, walk, and engage in light housework and daily activities.

Next, Plaintiff argues that I should find MetLife's decision to be arbitrary and capricious because MetLife failed to base its December 1st denial on specific reasons. Yet, as Plaintiff's counsel acknowledged at oral argument, the December 1st letter included several specific reasons for the denial: Dr. Allen's assessment of Plaintiff's physical abilities, Dr. Allen's report of her infrequent visits for treatment, and Plaintiff's own account of her daily activities. (R.273-74; *1/23/06 Tr.* at 4-5). Plaintiff nonetheless argues that MetLife's statement of reasons amounted to mere "boilerplate." *1/23/06 Tr.* at 5. Yet, ERISA requires only that MetLife "provide adequate notice ... setting forth the specific reasons for such denial, written in a manner calculated to be understood." *See* 29 U.S.C. § 1133(1). This is exactly what MetLife did here.

*8 Plaintiff also contends that MetLife has acted arbitrarily by requiring objective evidence of cognitive impairment and fatigue when the Plan ostensibly contains no such requirement. This argument is puzzling. As I noted above, the Plan requires Plaintiff to provide MetLife with *"medical evidence, satisfactory to MetLife, of the nature, extent, and continuation of any illness or disability ...."* (R.48). Thus, the Plan certainly authorized MetLife to require Plaintiff to offer something more than Plaintiff's own subjective complaints to establish a disabling condition. Plaintiff failed to provide any such medical evidence with respect to her claims of cognitive impairment and fatigue. That failure, combined with considerable evidence--from

Drs. Allen, Burns, Bellville, and Plaintiff herself that she was not totally disabled--convinced MetLife to terminate. The Third Circuit has upheld partial reliance "upon a lack of objective evidence," where the administrator gave all the available evidence "a full and fair review." *Delande v. ING Employee Benefits,* 112 Fed. Appx. 199 (3d Cir.2004). MetLife fully reviewed all available evidence of Plaintiff's condition. That Plaintiff provided absolutely no medical evidence to support her complaints of cognitive impairment and fatigue certainly does not undermine MetLife's decision.

Significantly, although Plaintiff correctly notes that the Eighth Circuit has held that "plan administrators may not require objective medical evidence" of fatigue, the Eighth Circuit has not prohibited plan administrators from considering the absence of objective evidence in their decision-making. *See Abram v. Cargill,* 395 F.3d 882, 887 (8th Cir.2005) ; *Pralutsky v. Metro. Life Ins. Co.,* 2006 U.S.App. LEXIS 1142 (8th Cir.2006). To the contrary, the Eighth Circuit recently concluded that if a plan authorizes the administrator to request "documentation" and "proof" of a disability, it is not "unreasonable ... to interpret the plan to require provision of objective evidence as part of the 'proof' and 'documentation." ' *Pralutsky* at *15-*16. *See also Hunt v. Metro. Life Ins. Co.,* 425 F.3d 489, 491 (8th Cir.2005); *Hensley v. IBM,* 123 Fed. Appx. 534, 538-39 (4th Cir.2004). That is precisely the situation that obtains here.

Plaintiff's reliance on decisions rejecting objective evidence requirements for diagnoses such as fibromyalgia and chronic fatigue syndrome is similarly misguided. *See Pl. Memo* at 25 (citing *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 442-43 (3d Cir.1997); *Wilkins v. Hartford Life & Acc. Ins. Co.,* 299 F.3d 945, 947 (8th Cir.2002)). Here, MetLife did not disagree with the "diagnosis of Lupus through objective blood tests," but with whether the manifestations of Lupus left Plaintiff unable to work. *Def. Resp.* at 6. The First ·Circuit described this distinction in *Boardman v. Prudential Ins. Co.:*

In this case, Prudential did not require Boardman to present objective medical evidence to establish her illnesses. On the contrary, Prudential was willing to accept that Boardman suffered from the illnesses she reported to her doctors. Rather, Prudential wanted objective evidence that these illnesses

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



rendered her unable to work. While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis.

*9 337 F.3d 9, 17 (1st Cir.2003). Dr. Bellville noted that Plaintiff did not supply records of a "mental status examination" or other testing of Plaintiff's cognitive functioning. Likewise, the Court in *Schlegel v. Life Ins. Co.* described evaluations of a claimant's "orientation, memory, language, and knowledge" abilities in upholding an administrator's claim denial based on the absence of objective evidence. *See* 269 F.Supp.2d 612, 620 (E.D.Pa.2003). Accordingly, MetLife has not acted improperly by including the absence of objective evidence among its reasons for denial.

Similarly, Plaintiff requests that I conclude that MetLife's "decision to credit a non-treating physician over [a] treating physician's opinion ... was not reasonable." *Pl. Mem.* at 29, n. 4. To the contrary, as described above, MetLife credited many of Dr. Allen's observations. Even if MetLife had relied only on the views of its consulting doctors, however, "administrators of ERISA plans are not obligated to accord special deference to the opinion of a claimant's treating physician. [The Plan administrator] is therefore justified in placing reliance on the opinions of its own consulting doctors and need not provide a special explanation of its decision to do so." *Nichols v. Verizon Communs.,* 78 Fed. Appx. 209, 211-12 (3d Cir.2003).

Plaintiff further alleges that MetLife has abused its discretion by "cherry-picking" medical evidence, and ignoring the views of the Plaintiff's treating physicians. MetLife's letters hardly reveal this to be the case. Rather than single out the most favorable medical evidence--such as Dr. Allen's March 11, 2004 assessment that Plaintiff could sit for eight hours continuously--MetLife relied on Dr. Allen's less-optimistic April 23, 2004 evaluation. Nor did MetLife ignore Dr. Allen's statements about Plaintiff's continued symptoms and other negative medical evidence. Rather, it indicated that it had considered those statements but nonetheless found the evidence insufficient to show a continuing disability.

Significantly, Plaintiff also offers decisions in which the plan administrator made a decision to terminate without any supporting evidence, or where the court applied a standard other than deferential review. For example, the Seventh Circuit in *Govindarajan v. FMC Corp.* upheld the reversal of an administrator's "completely erroneous assertion" that was completely unsupported by the medical record. 932 F.2d 634 (7th Cir.1991). Similarly, in *Myers v. Hercules,* the Fourth Circuit reversed a plan administrator--using that Court's eight-part test--where the administrator's decision contradicted the assessments by all three doctors in the record, who "opined that [claimant] remained totally disabled." 253 F.3d 761 (4th Cir.2001). Although the Court used the language "arbitrary and capricious" in *Rosen v. Provident Life*--the only case Plaintiff cites from a court in the Third Circuit--the Court also stated that it would "apply a heightened review ... caused by [the] insurer's role in both funding and administering the claims...." 2003 U.S. Dist. LEXIS 17402 at *21-*22 (E.D.Pa.2003). And the case from which Plaintiff apparently takes her "cherry-picking" language is entirely inapposite: in *Spangler v. Lockheed Martin Energy Systems, Inc.,* the Sixth Circuit criticized an administrator for actually withholding medical evidence from the doctor hired to perform an independent evaluation. 313 F.3d 356 (6th Cir.2002). Plaintiff has not alleged that MetLife withheld information from Drs. Burns and Bellville.

*10 Finally, Plaintiff suggests that I should adopt language from two Eighth Circuit decisions and hold that: 1) MetLife's failure to obtain Plaintiff's Social Security records is a "serious procedural irregularity" mandating heightened scrutiny; and 2) MetLife was required to furnish copies of Dr. Burns's and Dr. Bellville's assessments to Plaintiff before ruling on her appeal. *See Pl. Memo.* at 32-25 (citing *Abram v. Cargill,* 395 F.3d 882 (8th Cir.2005) (copies of reviewing doctor's reports on appeal); *Harden v. Am. Express Fin. Corp.,* 384 F.3d 498 (8th Cir.2004) (Social Security records)).

Even if these cases were controlling in the Third Circuit, their reasoning is not applicable here. First, Plaintiff neglects to note that she has not alleged any facts similar to the" procedural irregularity" in *Harden.* There, the claimant did not submit medical evidence to the plan administrator because the administrator wrongly led the claimant to believe

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
**(Cite as: 2006 WL 343223, \*10 (E.D.Pa.))**

Page 8

that it had obtained his Social Security records, including the medical evidence. And unlike *Abram,* where the Eighth Circuit created a right to review the insurer's responses to a claimant's new medical evidence, Dr. Burns and Dr. Bellville assessed virtually the same medical evidence considered in the original claim denial. *See* 395 F.3d at 885 (describing the additional medical evidence submitted for the appeal). I therefore cannot conclude that Plaintiff is entitled to "a continuing cycle of additional reports followed by rejoinders ... contrary to the regulatory scheme [of] expeditious resolution of appeals" solely to respond to the reviewing doctors' brief consideration of Plaintiff's new evidence. *See Forrester v. Metropolitan Life Ins. Co.,* 2005 U.S. Dist. LEXIS 32984 (D.Kan.2005). Like Plaintiffs' other arguments, I find these unpersuasive.

**III. Plaintiff Concedes that Summary Judgment Should Be Granted in Favor of Warner-Lambert.**

Plaintiff also alleges that Warner-Lambert "failed or refused to provide Plan documents" in violation of § 502(c) of ERISA. *See Complaint* at ¶ 13--¶ 15. At oral argument, Plaintiff's counsel stated that this allegation had been withdrawn because the case law is not "strong enough to rely on." *1/23/06 Tr.* at 18. Accordingly, I will not consider this claim further.

### CONCLUSION

In sum, Plaintiff asks me to contravene controlling authority, re-weigh the evidence MetLife reviewed, and come to a different decision. The Third Circuit has made clear, however, that I am "not free to substitute [my] own judgment for that of the defendants in determining eligibility for plan benefits." *Abnathya v. Hoffman-La Roche, Inc.,* 2 F.3d 40, 41 (3d Cir.1993); *see also Lasser* at 384 (stating the "substantial evidence" standard for arbitrary and capricious review). Accordingly, I grant summary judgment to Defendants.

The Motion for Summary Judgment by MetLife and Warner-Lambert is GRANTED.

**\*11** The Motion for Summary Judgment by Plaintiff is DENIED

An appropriate ORDER follows.

### *JUDGMENT*

AND NOW, this 14th day of February, 2006, upon consideration of the cross-motions for summary judgment (Doc. Nos.12, 13) and all responses thereto, and for the reasons set forth in the accompanying memorandum, it is ORDERED that Defendants' Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED.

JUDGMENT IS ENTERED in favor of Defendants, Metropolitan Life Insurance Company and Warner-Lambert Company, and against Plaintiff, Tammany Hoover.

Slip Copy, 2006 WL 343223 (E.D.Pa.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1337509 (S.D.N.Y.)
(Cite as: 2005 WL 1337509 (S.D.N.Y.))

**Page 1**

**H**

## Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
**Sharon KLECHER, Plaintiff,**
v.
**METROPOLITAN LIFE INSURANCE
COMPANY, and the Oxford Health Plans, Inc.
Employee
Welfare Plan, Defendants.**
**No. 01CIV9566PKL.**

June 6, 2005.

Fusco, Brandenstein & Rada, P.C., Woodbury,
NY, Aba Heiman, for Plaintiff.

Lester Schwab Katz & Dwyer, LLP, New York,
NY, Carl J. Schaerf, Allan M. Marcus, for
Defendants.

*OPINION AND ORDER*

LEISURE, J.

*1 Plaintiff Sharon Klecher brings this action under
the Employee Retirement Income Security Act of
1974 ("ERISA"), 29 U.S.C. § 001 *et seq.,* and
specifically under 29 U.S.C. § 1132(a)(1)(B),
challenging the termination of Long-Term Disability
("LTD") benefits under her employer's benefit plan.
Plaintiff brings this suit against defendants, the
Metropolitan Life Insurance Company ("MetLife")
and The Oxford Health Plans, Inc. Employee
Welfare Plan ("the Plan"). On June 11, 2002, the
parties cross-moved for summary judgment pursuant
to Rule 56 of the Federal Rules of Civil Procedure.
This Court granted in part defendants' motion and
denied in part plaintiff's motion on June 5, 2003.
*Klecher v. Met. Life Ins. Co.,* No. 01 Civ. 9566,
2003 U.S. Dist. LEXIS 9572 (S.D.N.Y. June 5,
2003). On July 9, 2003, plaintiff sought leave to
amend her Complaint under Rule 15 of the Federal
Rules of Civil Procedure. On August 27, 2004, the
Court denied plaintiff's request to file her proposed
amended complaint but granted her request to file an
amended complaint with the limited changes of
adding Oxford Health Plans, Inc. ("Oxford") as a
named defendant and repleading her claim for

breach of fiduciary duty as to MetLife as one for
improper denial of benefits under 29 U.S.C. §
1132(a)(1)(B). *Klecher v. Met. Life Ins. Co.,* 331
F.Supp.2d 279 (S.D.N.Y.2004). Plaintiff filed her
amended complaint on November 4, 2004, pleading
the ERISA violation but apparently not adding
Oxford as a defendant. Defendant now moves for
renewed summary judgment under Rule 56 and
plaintiff moves for judgment on the pleadings under
Rule 12(c), based on plaintiff's only remaining
claim asserting that defendants violated 29 U.S.C. §
1132(a)(1)(B) in terminating her LTD benefits under
the Plan. For the following reasons, defendants'
motion is granted and plaintiff's motion is denied as
there is no material issue of fact in dispute.

### BACKGROUND [FN1]

FN1. The following is derived from the
Administrative Record ("AR") of plaintiff's disability
benefits case file (Affidavit of Carl J. Schaerf, Esq.
("Schaerf Aff.") Ex. B) and the facts the parties have
agreed upon based on their statements of undisputed
material facts pursuant to Local Rule of the United
States District Court for the Southern District of New
York 56.1. It does not constitute a finding of fact by
the Court. These facts were also detailed in the
Court's first Opinion granting in part and denying in
part the parties cross-motions for summary
judgment, *Klecher,* 2003 U.S. Dist. LEXIS 9572, at
*1-10, and in the Court's Order allowing plaintiff to
amend her Complaint in a limited manner, *Klecher,*
331 F.Supp.2d at 280.

### I. *The Parties*

Plaintiff Sharon Klecher was actively employed by
Oxford as a Director of Provider Operations from
January 2, 1996 (AR 149, at 2)    [FN2] until
October 20, 1998 when she took disability leave due
to back pain (Defendants' Rule 56.1 statement filed
with its first motion for summary judgment on April
1, 2002 ("Defs.' 56.1") attached to Defendants'
Notice of Motion, dated October 29, 2004, at Ex. B
¶¶ 5, 7). She has not returned to work and is
currently receiving Social Security Disability
benefits. (*See* AR 157-61.)

FN2. The AR is bate stamped, therefore the numbers
cited refer to the bate stamp numbers.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Defendant MetLife is the issuer and administrator of the Plan, established and maintained by Oxford to provide eligible Oxford employees with LTD benefits. (Defs.' 56.1 ¶¶ 1-2.)

## II. *Plaintiff's Medical History Prior to Receipt of Disability Benefits*

Plaintiff Sharon Klecher has suffered from lower back pain since as early as 1990. (AR 300.) In 1995, Magnetic Resonance Imaging ("MRI") showed that she suffered from a mild narrowing of her vertebral spinal disc and showed evidence of disc desiccation. (*Id* . 228-29.) This was treated with physical therapy, which improved the pain. ( *Id.* 149, at 2.) In October 1998, plaintiff complained of reinvigorated back pain coinciding with her third pregnancy. (*Id.* 300.) On October 20, 1998, plaintiff began receiving short term disability benefits and, on April 21, 1999, she was granted LTD benefits pursuant to the Plan.

## III. *The Plan*

\*2 The Plan authorizes LTD benefits for Oxford employees deemed disabled depending on the following pertinent criteria:

[D]ue to an Injury or Sickness, you require the regular care and attendance of a Doctor and:
1. you are unable to perform each of the material duties of your regular job; and
2. after the first 24 months of benefits, you must be unable to perform each of the material duties of any gainful work or service for which you are reasonably qualified.

(Declaration of Jeanne Rudell ("Rudell Decl.") Ex. A at 16, attached to Defendants' Notice of Motion, dated October 29, 2004.) The Plan also grants MetLife and other Plan fiduciaries:

discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(*Id.* at 39.)

## IV. *Denial of Benefits and Appeals*

On May 19, 1999, Drs. Joseph P. Communale, Jr.,

M.D. and Edward Glenn, M.D. administered another MRI on plaintiff which revealed that she suffered from degenerative disc disease and central vertebral disc herniation (protrusion of the disc) without evidence of spinal stenosis (narrowing of the spinal column) or foraminal encroachment. (AR 250.)

On July 1, 1999, Klecher's primary care physician, Dr. Eileen Korpi, in her Attending Physician Disability Claim Statement (*id.* 243-45), noted that plaintiff suffered from a herniated lumbar disc and severe back pain with radiculopathy (disease of the spinal nerve roots). (*Id.* 243.) The statement maintained that plaintiff had no ability to sit, stand, walk, carry, twist, bend, reach or operate a motor vehicle. (*Id.* at 245.) Based on these restrictions, Dr. Korpi surmised that plaintiff could not work at all. (*Id.*) The prognosis for improvement was "possibly after delivery in 6 months." (*Id.*) Dr. Korpi's patient notes from July 12, 1999 indicate that plaintiff's back pain had improved "six weeks postpartum" but, based on plaintiff's description of her normal work routine, Dr. Korpi strongly recommended that plaintiff not return to work for at least six months. (*Id.* 273.) On September 9, 1999, Dr. Korpi examined plaintiff again and noted that she was in pain and had a palpable (noticeable by touch) muscle spasm in her upper back. (*Id.*)

On September 28, 1999, MetLife's "in house physician" (*id.* 298), Dr. Amy Hopkins, M.D., M.P.H., PhD, [FN3] reviewed plaintiff's medical history. (*Id.* 300.) Dr. Hopkins found it inconsistent that plaintiff's treatment plan for residual back pain consisted largely of maintaining a state of recline as "[t]here is no documentation that she is a recumbent most of the day, which would not be the indicated tx [treatment] for back pain in any case." (*Id.*) Dr. Hopkins recommended that,

> FN3. As the Court noted in its prior Order, Dr. Hopkins has been described alternatively as a "non-examining consultant" (Plaintiff's Memorandum of Law in Support of her Cross-Motion for a Judgment on the Administrative Record and in Opposition to Defendants' Renewed Motion for Summary Judgment ("Pl.'s Mem.") at 13), an "independent consulting physician" (Defendants' Memorandum of Law in Support of Renewed Motion for Summary Judgment ("Defs.' Mem.") at 4), and an "in-house physician" (AR 298). *See Klecher*, 2003 U.S. Dist.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



LEXIS 9572, at *4 n. 2. Defendants maintain that Dr. Hopkins was not a MetLife employee but was only an independent consultant. (Defendants' Memorandum of Law in Opposition to Plaintiff's Cross-Motion for Judgment on the Administrative Record and Reply Memorandum of Law in Further Support of Defendants' Renewed Motion for Summary Judgment ("Defs.' Reply") at 11.)

**\*3** [s]ince EE's [employee plaintiff's] sx [symptoms] have improved since the birth of her child, and no neurologic deficits are documented, there does not appear to be any reason why EE cannot return to her regular duties which are described as sedentary to light. Her MRI findings are mild and would not preclude any specific type of work.

(*Id.*) Dr. Hopkins did not recommend any further testing because "the documentation supports the lack of significant functional impairment." (*Id.* 300-01.)

MetLife, presumably concerned with the veracity of plaintiff's LTD benefits claim, employed InPhoto Surveillance, Inc. ("InPhoto") to observe plaintiff at her home for two days. On September 30, 1999, InPhoto observed plaintiff walking one of her children from her home to the curb for the school bus. (*Id.* 293.) In the afternoon, InPhoto observed and videotaped plaintiff walking for three minutes around the outside of her home "in a normal, unrestricted fashion." (*Id.* 294.) Approximately a half-hour later, plaintiff was observed entering her neighbor's house, but, "[d]ue to the brevity of this activity, it was not possible to obtain videotape." (*Id.*) Less than ten minutes later, plaintiff was videotaped walking back to her house "in a normal, unrestricted fashion." (*Id.*) Finally, at 3:20 p.m., InPhoto took videotape of plaintiff retrieving her mail from her mailbox, again walking normally. (*Id.*) InPhoto summarized that day's observations as follows:

Ms. Klecher was observed walking and carrying in a normal, unrestricted fashion. She does not appear to be physically handicapped or disabled, nor does she wear any visible back brace or cervical collar. We note that she does not utilize the support of a cane while moving about.

Approximately three minutes of videotape were obtained on this day.

(*Id.*) In Photo had surveilled plaintiff for a total of ten hours. InPhoto continued its surveillance on October 1, 1999, videotaping plaintiff carrying her

infant child to and from her house without obvious restriction. (*Id.* 295.) Two minutes of videotape were obtained out of ten hours of observation. (*Id.* 296.) InPhoto supplied substantially the same summary as that for September 30, 1999. (*Id.*)

### A. *Initial Termination of LTD Benefits*

By letter dated October 4, 1999, MetLife advised plaintiff that, based on an ongoing review of her eligibility, her LTD benefits were discontinued effective October 1, 1999. (*Id.* 298; Defs.' 56.1 ¶ 10.) MetLife reviewed medical records from Dr. Korpi and Spagnoli Physical Therapy and plaintiff's claim file in its entirety. (AR 298.) The file was also reviewed by Dr. Hopkins. (*Id.*) The letter stated that, though plaintiff "may experience some discomfort there is no medical documentation or clinical data presented" supporting a diagnosis prohibiting plaintiff from performing her sedentary to light job duties. (*Id.*) MetLife finally advised plaintiff that she could file a written request for review of her claim within sixty days of the letter, complete with new medical information and facts important to reconsideration. (*Id.*)

### B. *First Appeal*

**\*4** On January 23, 2000, plaintiff's legal counsel, Aba Heiman, Esq., submitted a letter requesting that MetLife review its decision to terminate plaintiff's LTD benefits. (*Id.* 195.) Mr. Heiman directed MetLife's attention to new medical information including: (1) a report and studies from Dr. Scott McWilliams, M.D., neurologist, conducted in December of 1999; (2) medical records from Drs. Eileen and Carl T. Korpi, M.D. encompassing December 14, 1994 through December 2, 1999; and, (3) a narrative medical report and testing from Dr. Susan Jacoby-Berlin, neurologist, dated November 19, 1999. (*Id.* 195-96.) Mr. Heiman pointed out that the electromyogram ("EMG"), which records the electrical activity in muscles, administered by Dr. McWilliams on December 30, 1999, found lumbar radiculopathy which was consistent with the May 19, 1999 MRI's evidence of disc herniation. (*Id.* 196.)

On February 22, 2000, Dr. Hopkins reviewed plaintiff's case file again along with the new medical information and InPhoto's surveillance observations. (*Id.* 192-93.) Dr. Hopkins stated that plaintiff's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2005 WL 1337509, *4 (S.D.N.Y.))

radiculopathy had been present since 1995 without documented worsening and without impeding her ability to perform her job duties. (*Id.* 192.) She noticed further discrepancies between plaintiff's notation of symptoms and the medical data: "EE stated that she has difficulty walking, but her gait was WNL [within normal limits] on exam. She stated that she cannot lift, yet she was seen to be carrying her child without difficulty." (*Id.*) Further, Dr. Hopkins could not ascertain how plaintiff's loss of sensitivity and motor function in her leg had worsened or would impede her ability to work. (*Id.* 193.) Further, Dr. Hopkins found that Dr. Jacoby-Berlin's "statement that EE is totally, permanently disabled does not have medical and functional information to substantiate it." (*Id.*) Dr. Hopkins concluded that plaintiff's symptoms were out of proportion with Dr. Jacoby-Berlin's physical findings. (*Id.*) Thus, Dr. Hopkins recommended that plaintiff take a functional capacity evaluation ("FCE") in order to corroborate plaintiff's claimed impairments. (*Id.*)

On February 23, 2000, MetLife requested that plaintiff be authorized to take the FCE. The FCE "is a means of testing a person's lifting, carrying abilities, positional tolerances, dexterity, general endurance levels and ability to lift specific weights to certain heights. The typical [FCE] requires 4-8 hours of testing over 1 or more days." (*Id.* 188.) On March 3, 2000, Dr. Eileen Korpi refused to authorize plaintiff's taking of the FCE, stating, "I do not believe Sharon Klecher is able to perform this activity. This would be detrimental to her health." ( *Id.*)

On March 14, 2000, MetLife sent Mr. Heiman a five-page letter detailing its reasons for withdrawing plaintiff's LTD benefits and stating that it continued to believe that withdrawal was appropriate despite the new medical information. (*Id.* 149-52.) The letter stated that,

*5 [a]lthough Ms Klecher reported to her providers of record that her duties required extensive travel and thus met light to heavy work strength criteria (depending on the report read), the Human Resources Contact at the Policy Holder discloses her job does not include any travel and is sedentary in nature.

(*Id.* at 149, second unnumbered page.) The letter went on to define sedentary work as:

[e]xerting up to 10 pounds of force occasionally

(Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 or more of the time) to lift, carry. [ *sic* ] push, pull or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking and standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other criteria are met.

(*Id.* (quoting United States Department of Labor, *Dictionary of Occupational Titles* App. C (4th ed. Rev.1991)).) MetLife again noted that plaintiff's symptoms had improved following the birth of her third child on May 15, 1999. (*Id.*) Regarding the new medical reports, MetLife acknowledged that Dr. McWilliams found "mild to moderate right lumbar radiculopathy" but stated that it was "unclear from the brief report of examination how and why Dr. Jacoby-Berlin was able to conclude that Ms Klecher was limited in these activities [sitting, standing walking, lifting, et al.] when all but the [EMG] revealed normal activity and ability." (*Id.*) MetLife explained that, while there was no evidence of documented medically necessary restrictions on plaintiff's movement, there was documented evidence of her walking normally while under surveillance. MetLife qualified this remark by stating,

[w]hile we do not suggest that the brief periods of walking and carrying her 5 month old infant indicate or support an ability to return to work, we do conclude that her reports of discomfort and inability to perform routine tasks is not corroborated by the test results, the clinical examination findings, or the observations of the surveillance investigators.

(*Id.*) MetLife elaborated on the purpose of the FCE and argued it was not dangerous to plaintiff's health. (*Id.* 150.) Finally, MetLife differentiated plaintiff's impairment as an irreversible medical condition from a disability justifying benefits, *i.e.* an inability to engage in gainful activity because of an impairment. (*Id.* 151.) MetLife found that the medical documentation of plaintiff's right lumbar radiculopathic symptoms did not support a finding of disability so severe as to preclude plaintiff's return to her sedentary job. (*Id.* 152.) Thus, MetLife concluded its denial of benefits was appropriate and its October 1, 1999 decision remained in effect.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2005 WL 1337509, *5 (S.D.N.Y.))

### C. *Second Appeal*

On November 6, 2000, Mr. Heiman wrote to MetLife requesting that it reopen plaintiff's claim for evaluation. (*Id.* 153.) Mr. Heiman enclosed new information consisting of (1) plaintiff's notice of award of Social Security benefits, dated October 16, 2000; (2) Report from Dr. Rashed Ayyub, M.D., orthopedist, dated March 23, 2000; (3) report of Dr. Eileen Korpi, dated April 11, 2000 and August 29, 2000; and (4) Klecher's own description of her job duties. (*Id.*) Mr. Heiman argued that the surveillance video was not dispositive of whether plaintiff should be denied benefits under the plan because "the patient isn't playing tennis or unloading trucks. Neither is she in a wheel chair or vegetating in a dark room, but that is of course not required to obtain benefits." (*Id.*) Based on the medical diagnoses of Klecher's condition and his characterization of her job duties as "Light" rather than "Sedentary," Mr. Heiman asked MetLife to reconsider the denial of benefits and pay Klecher's claim. (*Id.* 154.)

*6 The Social Security Administration's letter states that Klecher became disabled under that agency's rules on October 20, 1998. (*Id* . 157.)

Dr. Ayyub's report notes that plaintiff does not require a cane or assistance to walk. The report states that plaintiff suffers from "a lot of tenderness and muscle spasm of the lumbosacral spine," and limited spinal flexibility. (*Id.* 164.) He diagnosed her with herniated intervertebral disc of the lumbosacral spine and bilateral sciatica. (*Id.*) This, practically speaking, defines plaintiff as moderately disabled "in sitting and standing continuously for more than a few hours without interruption and walking more than a few blocks without interruption. She also has moderate disabilities in lifting more than a few lb [pounds] at present." (*Id.*) As far as plaintiff's prognosis for future treatment, Dr. Ayyub states that "claimant has reached maximum medical improvement." (*Id.*)

Dr. Korpi's August 29, 2000 report indicates that plaintiff has a disorder of the spine, herniated disc with spinal stenosis, significant pain, muscle spasm, and limited motion, none of which are likely to improve. (*Id.* 173.) Dr. Korpi states that plaintiff "is unable to stand for more than twenty minutes at a time, she is unable to sit for more than fifteen

minutes at a time, she is unable to do any lifting at all." (*Id.*) This, the doctor avers, is all confirmed by multiple medical evaluations, including those performed by neurosurgeon Dr. Raphael Davis and neurologist Dr. Jacoby-Berlin, along with the MRI and EMG results. (*Id.* 172.)

Plaintiff's description of her job duties contends that, in her role as Director of Provider Operations at Oxford, she is required to visit several hospitals per week. (*Id.* 178.) Plaintiff lives in Stony Brook, New York and the Oxford home office is one hour by car in Melville, New York. (*See id.*) She also visits New York City, Edison, New Jersey, and Norwalk, Connecticut once per week. (*Id.*) At each site, she is required to sit for four to five hours. (*Id.* ) Additionally, in New York City, she must walk five to ten blocks carrying her fifteen-pound computer, a briefcase, and personal items. (*Id.*) Often, though it is unclear exactly how often, plaintiff visits sites in Manhasset, White Plains, Staten Island, and Brooklyn, all in New York State. (*Id.*)

On November 14, 2000, Dr. Hopkins again reviewed plaintiff's claim. (*Id.* 144.) Based on a review of Drs. Ayyub and Korpi's submissions and classifying plaintiff's work level as sedentary, Dr. Hopkins concluded that:
The findings of physical examination do not correlate with the degree of impairment that EE claims to have. In addition, surveillance documented that EE's level of functioning was far in excess of that claimed. Dr. Korpi did not provide any comment on the surveillance results. There was no evidence of spinal stenosis or foraminal encroachment on MRI. Dr. Korpi refused to authorize an FCE, so specifics of functional capacity could not be evaluated.
*7 (*Id.*) Based on the above evaluation, Dr. Hopkins recommendation was that "[n]o physical impairment was documented in this record which precluded EE from RTW [returning to work], FT [full time], own occupation." (*Id.* 145.)

On November 15, 2000, MetLife advised Mr. Heiman that the new information provided did not alter its decision to discontinue plaintiff's benefits. ( *Id.* 142.) Following that final determination, plaintiff initiated the instant suit.

### DISCUSSION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2005 WL 1337509, *7 (S.D.N.Y.))

Page    6

### I. *Summary Judgment Standard*

A moving party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Holt v. KMI-Cont'l Inc.,* 95 F.3d 123, 128 (2d Cir.1996). The substantive law underlying a claim determines if a fact is material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). When considering the motion, the Court should not "resolve disputed issues of fact but ... assess whether there are any factual issues to be tried." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986).

To determine whether genuine issues of material fact exist, the Court must resolve all ambiguities and draw all justifiable inferences in favor of the nonmoving party. *See Anderson,* 477 U.S. at 255; *Holt,* 95 F.3d at 129. The moving party bears the burden of demonstrating that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Gallo v. Prudential Residential Serv. L.P.,* 22 F.3d 1219, 1223-24 (2d Cir.1994). "[T]he movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). Once the moving party discharges its burden of demonstrating that no genuine issue of material fact exists, the burden shifts to the nonmoving party to offer specific evidence showing that a genuine issue for trial exists. *See Celotex,* 477 U.S. at 324. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "A 'genuine' dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *Dister v. Cont'l Group,* 859 F.2d 1108, 1114 (2d Cir.1988) (citing *Anderson,* 477 U.S. at 248). The Second Circuit reviews a District Court's disposition of a summary judgment motion *de novo. Mario v. P & C Food Mkts.,* 313 F.3d 758, 763 (2d Cir.2002) (quoting *Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir.2001)).

### II. *Plaintiff's Claim That MetLife's Denial of Benefits Was Arbitrary and Capricious*

**\*8** The only claim surviving the Court's first Opinion granting in part and denying in part the parties' motions for summary judgment is plaintiff's claim that defendants denied her LTD benefits in violation of ERISA. (*See* Plaintiff's Second Amended Complaint ("Second Amended Complaint") ¶ 49 (requesting relief for violation of ERISA, 29 U.S.C. § 1132(a)(1)(B)).) Title 29 section 1132 provides for civil enforcement of a person's right to employment disability benefits "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132. In order to obtain relief under section 1132, plaintiffs "must first pursue any administrative means of redress provided by their benefit plans." *Yoran v. Bronx-Lebanon Hosp. Ctr.,* No. 96 Civ. 2179, 1999 U.S. Dist. LEXIS 8679, at \* 23 (S.D.N.Y. June 10, 1999) (Leisure, J.) (citing *Kennedy v. Empire Blue Cross & Blue Shield,* 989 F.2d 588, 594 (2d Cir.1993); *Leonelli v. Pennwalt Corp.,* 887 F.2d 1195, 1199 (2d Cir.1989)). "This exhaustion requirement is a jurisdictional prerequisite to a suit for benefits under ERISA." *Id.* (citing, *inter alia, Ambris v. Bank of N.Y.,* No. 96 Civ. 0061, 1998 U.S. Dist. LEXIS 15801, \*20 n. 7 (S.D.N.Y. Oct. 7, 1998); *Barnett v. IBM Corp.,* 885 F.Supp. 581, 586-87 (S.D.N.Y.1995)). Plaintiff has satisfied this requirement by submitting two requests to MetLife to review its decision to deny her benefits. MetLife twice refused to reverse its decision which "represented MetLife's final determination" of plaintiff's eligibility for LTD benefits. (AR 142.) This point is uncontested by the parties, thus, plaintiff's claim is properly before this Court.

The Court did not dispose of plaintiff's remaining claim in the last Opinion because it was unclear whether the operative benefits plan conferred discretionary authority upon the plan administrator to determine plaintiff's eligibility. *Klecher,* 2003 U.S. Dist. LEXIS 9572, at \*24-25 & n. 9. This issue has been resolved and is undisputed by the parties; both the 1998 and 1999 benefits plans

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



contained a discretionary clause and were distributed to plaintiff. (Pl.'s Mem. at 3; Defs.' Mem. at 3.) Therefore, as stated in the last Opinion, the proper legal yardstick by which the Court should measure plaintiff's claim is whether MetLife's denial of plaintiff's benefits was an arbitrary and capricious decision. *See Klecher,* 2003 U.S. Dist. LEXIS 9572, at *27 (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989)). In doing so, the Court may only look to the administrative record that was available to MetLife at the time of its decision. *Id.* (citing *Miller v. United Welfare Fund,* 72 F.3d 1066, 1071 (2d Cir.1995)). Under this deferential standard, the Court may reverse MetLife's decision to deny plaintiff LTD benefits only if the decision was "without reason, unsupported by substantial evidence, or erroneous as a matter of law." *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 442 (2d Cir.1995). The scope of the Court's power to review MetLife's decision as arbitrary and capricious is narrow. The Court cannot "substitute its judgment for that of the plan administrator as if the question of eligibility were being considered anew." *Yoran,* 1999 U.S. Dist. LEXIS 8679, at *31 (citing *Pagan,* 52 F.3d at 442). Moreover, the Court must let MetLife's denial of benefits stand if it was a reasonable decision. *Sharkey v. Ultramar Energy Ltd.,* 70 F.3d 226, 229 (2d Cir.1995); *Jordan v. Ret. Comm. of Rensselaer Polytech. Inst.,* 46 F.3d 1264, 1273 (2d Cir.1995). Following that, if there is a dispute as to the interpretation of the plan, the Court must side with the plan administrator's interpretation if it is reasonable. *Pagan,* 52 F.3d at 443; *see also Jordan,* 46 F.3d at 1273 (finding that where plaintiff's interpretation is "as reasonable as the interpretation adopted by the [plan administrator] the arbitrary and capricious standard" requires the Court "to defer to the interpretation of the [administrator]").

*9 Plaintiff claims that MetLife ignored evidence that she was disabled by relying solely on Dr. Hopkins' reports and the surveillance video. (Pl.'s Mem. at 14-15.) Further, plaintiff argues that Dr. Hopkins is not disinterested because she reviews over 500 claims per year for MetLife. (*Id.*) Finally, plaintiff argues that MetLife mistakenly characterized her job activity as sedentary where it should have been characterized as sedentary to light. (*See id.* at 12; Pl.'s Reply at 1-4.)

Defendants claim that the plan administrator's

decision was not arbitrary or capricious because it was based on plaintiff's medical records demonstrating she was no longer disabled to the extent it would prevent her from performing her sedentary job duties. Defendants support MetLife's decision with: (1) the May 20, 1999 MRI showing no evidence of spinal cord or nerve root compression (AR 317); (2) Dr. McWilliams' neurological report of normal gait, coordination and muscle power (*id.* 200-02); (3) InPhoto's surveillance video showing plaintiff walking with normal gait and holding her child (*id.* 274-75); (4) Dr. Ayyub's report finding plaintiff "ambulatory," walking without assistance (*id.* 163-65); and (5) Dr. Hopkins' three independent reviews of plaintiff's records concluding plaintiff was not sufficiently disabled (*id.* 144-45, 192- 93, 300-01). (Defs.' Mem. at 4-5; Defs .' Reply at 4-5.) Defendants claim that this evidence contradicted the diagnoses of Drs. Korpi and Jacoby-Berlin finding that plaintiff is sufficiently disabled to receive LTD benefits. (Defs.' Reply at 6 .) MetLife does not dispute plaintiff's underlying diagnosis; rather, MetLife only disputes that she was disabled to the point of being barred from performing her sedentary job functions. (*Id.* 6, 8 (citing MetLife's letter upholding its denial of plaintiff's benefits, dated March 14, 2000 (AR 186)).)

Defendants' arguments are persuasive and carry the day. MetLife reviewed plaintiff's eligibility for LTD benefits three separate times. During the course of those reviews, MetLife reasonably resolved the doctors' conflicting opinions regarding the effect of plaintiff's health on her ability to work by relying on the factual findings in the MRI, the doctors' own reports, the surveillance observations, and Dr. Hopkins' independent opinion. This comports with the Supreme Court's decree on the subject:

Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

*Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834 (2003); *see also, Fay,* 287 F.3d at 108

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2005 WL 1337509, \*9 (S.D.N.Y.))

("Despite [plaintiffs'] presentation of two qualified experts' opinions to the contrary, this Court cannot find Oxford's determination of medical necessity 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" ' (quoting *Pagan,* 52 F.3d at 442)). Plaintiff's blanket assertion that Dr. Hopkins is biased toward MetLife's position finds no support in the Administrative Record. That the doctor regularly reviews MetLife's claims and is referred to as an "in house physician" (AR 298) does not automatically trigger a finding that she is predisposed to denying any benefits claims that crosses her desk. The same is true for the allusion that MetLife is inherently biased in its decision to deny benefits based on its potential to gain economically in that denial. (*See* Pl.'s Mem. at 16 n. 13); *see, e.g., Rosenthal v. First UNUM Life Ins. Co.,* Nos. 02 Civ. 7661, 02 Civ. 7700, 04 Civ. 0845, 2005 U.S.App. LEXIS 4897, at \*2 (2d Cir. Mar. 24, 2005); *Fay,* 287 F.3d at 108 (finding that no conflict of interest existed where the record did not support such a conclusion and defendant only had a monetary bias in denying the sought benefits). Further, MetLife's overview of the entire claim cures any deficiencies in Dr. Hopkins' reports, including her omission of Dr. Ayyub's diagnosis. (*See* Pl.'s Mem. at 14.) In fact, any allegation that Dr. Hopkins' determination was "arbitrary and capricious" is moot for Dr. Hopkins did not make the decision to terminate plaintiff's benefits; rather that was the sole province of the plan administrator, MetLife, and it is MetLife's decision that the Court reviews. (*See id.* at 15.) Nor is this a case where the plan administrator improperly relied solely on the surveillance video. ( *See* Pl.'s Mem. at 6-7; *see also* Defs.' Reply at 10-11.) Rather, MetLife made a reasoned decision based on the complete, available record that plaintiff's health would not impair her conduct of the material duties of her job.

\*10 Plaintiff's claim that MetLife mischaracterized her job as sedentary, too, must fail. First, the Court notes that Dr. Hopkins' initial recommendation that plaintiff's diagnosis did not justify LTD benefits was based on plaintiff's job being "sedentary to light ." (AR 300.) However, to the extent that MetLife viewed plaintiff's job duties as solely "sedentary" in making its decision to continue to deny plaintiff's benefits, that view was not arbitrarily or capriciously held. Instead, MetLife characterized plaintiff's job based on her employer's human

resource department's classification and plaintiff's personal job description. While the human resource classification may not have been sufficiently close to the source to reflect accurately plaintiff's job duties, plaintiff's own description certainly was. In it, plaintiff notes travel obligations requiring her to sit in a car for up to two and a half hours at a time, coupled with the necessity of walking several blocks with a laptop, briefcase, and personal items. (*Id.* 178.) As stated above, sedentary jobs involve sitting most of the time, and "exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time)." (*Id.* 149, at 2d unnumbered page (quoting United States Department of Labor, *Dictionary of Occupational Titles* App. C (4th ed. Rev.1991)).) "Jobs are sedentary if walking and standing are required only occasionally and all other criteria are met." (*Id.*) It is the Court's view that MetLife's decision that plaintiff's job fell within the above definition was not arbitrary or capricious. Plaintiff's only non-sitting activity was the five to ten block walk once per week in New York City with the aforementioned items. That certainly would constitute walking "only occasionally" and it appears that "all other criteria are met." It is inapposite that her so-called "commute" to numerous cities were required under her job description (Pl.'s Reply at 1-3; Defs.' Reply at 3-4) for those commutes, too, are reasonably construed as sedentary in nature under the above definition.

Finally, in the unlikely event that MetLife misconstrued plaintiff's job as "sedentary" when it was actually "light" based on plaintiff's notation that she was required to lift and carry her fifteen pound laptop, the mistake is not fatal. The lifting of the computer was not a material aspect of her job that plaintiff was unable to perform, thus justifying a grant of LTD benefits. The material aspects of her job as viewed from her own description, were sitting in a car or working at a desk. As stated above, MetLife reasonably determined plaintiff was capable of these activities based on its review of plaintiff's entire file and the video surveillance. [FN4]

> FN4. The Court also notes that plaintiff's claim that lifting the computer was beyond her capabilities is directly contradicted by the surveillance video showing her carrying an almost five month old infant from her home.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2005 WL 1337509, *10 (S.D.N.Y.))

## CONCLUSION

The Court finds nothing in the record before it suggesting that MetLife's twice reviewed decision to discontinue plaintiff's LTD benefits was arbitrary and capricious. Therefore, defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 is hereby GRANTED. Plaintiff's cross-motion for judgment on the Administrative Record pursuant to Federal Rule of Civil Procedure 12(c) is hereby DENIED.

**\*11** SO ORDERED.

Not Reported in F.Supp.2d, 2005 WL 1337509 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

. **2002 WL 32631988 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion for Summary Judgment (Jun. 05, 2002)**

. **2002 WL 32631990 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (Jun. 05, 2002)**

. **2002 WL 32631991 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opposition Brief (Jun. 05, 2002)**

. **2001 WL 34636183 (Trial Pleading) Amended Answer of Metropolitan Life Insurance Company and Oxford Health Plans, Inc. Employee Welfare Plan and Counterclaim of Metropolitan Life Insurance Company (Nov. 19, 2001)**

. **2001 WL 34636181 (Trial Pleading) Statement Pursuant to Local Rule 1.9 (Nov. 15, 2001)**

. **2001 WL 34636179 (Trial Pleading) Answer and Counterclaim of Metropolitan Life Insurance Company (Nov. 07, 2001)**

. **1:01cv09566 (Docket) (Oct. 31, 2001)**

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# EXHIBIT  B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

GAIL KERNAGHAN,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　)　　　C.A. No.: 05-402 (GMS)
　　　　　　　　　　　　　　　　　　　)
METROPOLITAN LIFE INSURANCE　　　　)
COMPANY, as fiduciary and administrator of　)
The IBM Long-Term Disability Plan,　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　Defendant.　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)

### DEFENDANT METROPOLITAN LIFE INSURANCE COMPANY'S SUPPLEMENTAL ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES DIRECTED TO DEFENDANT

Pursuant to Federal Rules of Civil Procedure 26(e) and 33, Defendant Metropolitan Life

Insurance Company ("MetLife") hereby supplements its responses to Plaintiff's Interrogatories

Directed to Defendant (the "Interrogatories") as follows:

**INTERROGATORY NO.: 2:**

As of the date the plaintiff's benefits under IBM's LTD Plan were terminated, please

state the name of the entity that was funding such benefits.

**ANSWER:** For all claims, including Ms. Kernaghan's, which go beyond the initial first year of
benefit, IBM pays continuation premiums which cover all plan costs, including administration
and payment of claims, for that year. If the costs exceed the money advanced by IBM, MetLife
collects the additional premium from a funding account funded by IBM.

McCARTER & ENGLISH, LLP

BY: _____

Paul A. Bradley (DE Bar ID #2156)
Tanya Pino Jefferis (DE Bar ID #4298)
919 North Market Street, Suite 1800
P. O. Box 111
Wilmington, DE  19899
(302) 984.6300; (302) 984-6399 (fax)
Attorneys for Metropolitan Life Insurance
Company

Date:  February 28, 2006

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

GAIL KERNAGHAN,                              :
                                             :
            Plaintiff,                       :    C.A. No. 05-402 (GMS)
                                             :
      v.                                     :
                                             :
METROPOLITAN LIFE INSURANCE                  :
COMPANY, as fiduciary and administrator of The :
IBM Long-Term Disability Plan,               :
                                             :
            Defendant.                       :
                                             :

### NOTICE OF SERVICE

I, Tanya Pino Jefferis, hereby certify that on February 28, 2006, I caused the foregoing

Defendant Metropolitan Life Insurance Company's Supplemental Answers To Plaintiff's First

Set of Interrogatories Directed To Defendant to be served via first class mail, postage prepaid

upon the following counsel of record:

Rick S. Miller, Esquire
Ferry, Joseph & Pearce, P.A.
824 Market Street, Suite 904
Wilmington, DE  19899

                              **McCARTER & ENGLISH, LLP**


                              /s/Tanya Pino Jefferis
                              Paul A. Bradley (DE ID No. #2156)
                              Tanya Pino Jefferis (DE ID No. #4298)
                              919 North Market Street, Suite 1800
                              P.O. Box 111
                              Wilmington, Delaware  19899
                              (302) 984-6300
                              Attorneys for Defendant Metropolitan Life
                              Insurance Company

## Discovery Documents

1:05-cv-00402-GMS Kernaghan v. Metropolitan Life Insurance Company

### U.S. District Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Jefferis, Tanya entered on 2/28/2006 at 4:05 PM EST and filed on 2/28/2006

**Case Name:** Kernaghan v. Metropolitan Life Insurance Company
**Case Number:** 1:05-cv-402
**Filer:** Metropolitan Life Insurance Company
**Document Number:** 18

**Docket Text:**
NOTICE OF SERVICE of Defendant Metropolitan Life Insurance Company's Supplemental Answers To Plaintiff's First Set Of Interrogatories Directed To Defendant re [13] Notice of Service by Metropolitan Life Insurance Company. Related document: [13] Notice of Service filed by Gail Kernaghan,.(Jefferis, Tanya)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=2/28/2006] [FileNumber=176055-0]
[4abd33acaa145f9573b92295a5d977f4b4ad1464e66b8a13394958e07c1f5bd5c333
fc47367ed91b2431abf1d7ca72754caa5ac085329a759ad6d219218af23e]]

**1:05-cv-402 Notice will be electronically mailed to:**

Paul A. Bradley     pbradley@mccarter.com,

Rick S. Miller     rmiller@ferryjoseph.com,

**1:05-cv-402 Notice will be delivered by other means to:**